(615 P.2d 774)

No. 50,644

CIT FINANCIAL SERVICES, INC., OF KANSAS, *Appellee*, v. HENRY GOTT, *et al.*; ERNEST A. PETERSON, *et al.*; KICE METAL PRODUCTS CO., INC.; ROBERT IRELAND and RAY BARBER, d/b/a Ireland and Barber, *Appellants*.

Opinion filed July 25, 1980.

*Paul S. McCausland* of Gott, Hope, Gott, Young & Saffels, P.A., of Wichita, for the appellant Henry Gott.

*Michael J. Jones* of Hershberger, Patterson, Jones & Roth, of Wichita, for the appellant Ernest A. Peterson.

*Jerry G. Elliott* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for the appellant Kice Metal Products Co., Inc.

*Bryson E. Mills* of Mills & Wessling, of Wichita, for the appellants Robert Ireland and Ray Barber.

*Ernest McRae* of McRae & Early, of Wichita, for the appellee.

Before FOTH, C.J., SPENCER and SWINEHART, JJ.

SPENCER, J.: In four actions consolidated for jury trial and on

appeal, CIT Financial Services, Inc., of Kansas (hereinafter plaintiff or CIT) seeks to recover amounts allegedly due and owing under certain written "leases" of copying equipment. After all of the evidence had been presented, the trial court sustained plaintiff's motion for directed verdicts in its favor and entered judgment in each case accordingly. Defendants have specified six issues on appeal, all of which are included in the proposition of whether the trial court erred in granting plaintiff's motion for directed verdicts.

Plaintiff's position at trial was that the respective defendants had purchased Royal Bond copiers and related equipment from SSS Corporation (hereinafter SSS), which company has since been adjudicated bankrupt; that the purchases were financed through plaintiff by means of written lease agreements; that, although the instruments evidencing the transactions were couched in lease terms, they were in fact and in law security agreements granting purchase money security interests to plaintiff and obligating defendants to pay plaintiff according to the terms of those instruments; and that defendants were in default, entitling plaintiff to accelerate the obligations to maturity.

Defendants admitted they obtained copiers from SSS but asserted the machines did not operate properly; that SSS made certain fraudulent representations relating to the machines; that SSS was the agent of plaintiff for the purpose of obtaining the lease agreements from defendants; and that plaintiff was responsible for the misrepresentations made to defendants and was subject to defenses which defendants would have had against SSS. In addition to allegations of agency, fraud, and failure of consideration, defendants relied on (1) unconscionability (K.S.A. 84-2-302); (2) breach of warranty of title (K.S.A. 84-2-312); (3) breach of express warranty (K.S.A. 84-2-313); (4) breach of implied warranty of merchantability (K.S.A. 84-2-314); and (5) breach of implied warranty of fitness for a particular purpose (K.S.A. 84-2-315).

In directing verdicts, the court ruled as a matter of law that no agency existed between plaintiff and SSS by which the defenses of fraud and failure of consideration could be asserted as against plaintiff, and that UCC article 2 was inapplicable to the transactions involved.

The facts of all four cases are essentially the same. SSS was formed in April of 1972 and was engaged in the business of

selling office machines and equipment. In 1973, Wallace Ure, the chief executive officer and major stockholder of SSS, contacted CIT for the purpose of making arrangements for financing certain office equipment then being sold by SSS. Ure thereafter met with John Burbank, a district sales manager for CIT, at which time CIT's "lease" program was explained. Following discussions between Ure and Burbank, SSS was established as a so-called "seller prospect" for CIT.

Among equipment carried for sale by SSS were "Royal Bond" copier machines, marketed by Royal Typewriter Company, a division of Litton Business Systems, Inc. During 1973, Ure obtained certain "speed-up kits," which when installed on Royal Bond copiers had the effect of increasing the copy speed from ten to twenty copies per minute. After installation of the speed-up kits, SSS began selling the modified copiers under the label "Royal Bond Mark I." The defendants in each case obtained such copiers generally in the manner set forth below.

Pursuant to the arrangement between CIT and SSS, SSS was furnished with sets of "lease agreement forms" and was provided instructions on the proper manner of completing those forms. CIT also provided SSS with a lease timetable, sets of UCC financing statements, and other documents. If CIT financing was to be utilized, it was expected that SSS would follow CIT's instructions in filling out the forms and SSS was aware of CIT's requirements in doing so. However, customers of SSS were not required to finance their purchases through CIT. Each had the option to arrange other financing or to pay cash. Ure testified that SSS had dealt with companies other than CIT in similar lease-financing arrangements.

When there was a prospective customer wishing to purchase a Royal Bond copier and desiring CIT financing, SSS personnel would fill out a lease application form with the customer's assistance, or would have it filled out by the customer who would return it to SSS, to be forwarded to CIT. SSS would then collect from the customer and forward to CIT the first month's advance lease payment required under the lease. SSS would complete the UCC financing statement, secure the customer's signature, and forward it to CIT, and CIT would cause it to be filed with the secretary of state upon completion of the transaction. Upon receipt of the completed documents, CIT would conduct its own investigation of the customer, make a credit check, and decide

whether to approve the transaction. If approved for financing, CIT would send SSS a purchase order and notify the customer of approval. SSS would then ship the copier to the customer, invoice CIT as the "purchaser," and CIT, after receiving acknowledgment of receipt of the equipment dated and signed by the customer together with assurance of the customer's then satisfaction with the machine, would issue its check to SSS in payment for the equipment.

The lease agreements were executed only by CIT and the customer, but clearly reflect CIT as "lessor," SSS as "seller," and the various defendants as "lessee." The lease agreements were irrevocable and the customers were obligated to pay a fixed amount per month over a period of sixty months. Payments under the lease were calculated to return to CIT the purchase price of the equipment plus sales tax and finance charges. Sales tax was paid by CIT. The lease provided that ownership of the equipment was to remain in CIT and, upon default, CIT had the option of declaring the entire obligation immediately due and payable. After all rentals to become due thereunder had been paid, lessee had the option to purchase the equipment for the sum of $1 or to renew the lease for annual periods at reduced rental. In addition, the lease contained the following clause:

"Lessor, not being the manufacturer of the equipment, nor manufacturer's agent, *makes no warranty or representation, either express or implied, as to the fitness, quality, design, condition, capacity, suitability, merchantability or performance of the equipment or of the material or workmanship thereof, it being agreed that the equipment is leased 'as is' and that all such risks, as between the Lessor and the Lessee, are to be borne by the Lessee at its sole risk and expense.* Lessee accordingly agrees not to assert any claim whatsoever against the lessor based thereon. . . . Lessor shall have no obligation to install, erect, test, adjust or service the equipment." (Emphasis in original.)

In October, 1974, CIT discontinued its financing arrangements with SSS customers and SSS thereafter went into bankruptcy. Defendants experienced various difficulties with the machines, allegedly as a result of the installation of the "speed-up kits," and discontinued payments to CIT. These actions followed.

In summation, the record in this case reveals: (1) CIT had no personal contact with the defendants until shortly before these actions were commenced. (2) Negotiations for the sale and purchase of each Royal Bond Mark I copier were conducted between SSS and the various defendants. (3) The equipment ordered by defendants was delivered and installed by SSS and customer

complaints were to be made to SSS. (4) CIT did not select or inspect the equipment, did not maintain personnel to service the equipment, and was not a manufacturer or dealer in like equipment. (5) The monthly payments under each lease were calculated to return to CIT the purchase money advanced for the equipment, plus state sales tax and finance charges. (6) It was not contemplated that any of the equipment would be returned to CIT, and CIT maintained no storage facilities for such equipment. (7) In each case, at the end of the term of the lease and absent default, the lessee was granted the option to purchase the equipment for the nominal sum of $1.

K.S.A. 84-1-201(37) defines "security interest" and provides in part:

"Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) *an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."* Emphasis added.

### K.S.A. 84-9-102 provides in part:

"(2) This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This article does not apply to statutory liens except as provided in section 84-9-310."

### In the Official UCC Comment to that section, we find:

"Transactions in the form of consignments or leases are subject to this Article [article 9] if the understanding of the parties or the effect of the arrangement shows that a security interest was intended. . . . When it is found that a security interest as defined in Section 1-201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it. The list of traditional security devices in subsection (2) is illustrative only; other old devices, as well as any new ones which the ingenuity of lawyers may invent, are included, so long as the requisite intent is found."

From this record, we conclude that, as between CIT and the various defendants, the transactions represented by their lease agreements were intended to create a security interest as defined by K.S.A. 84-1-201(37)(b), and the rights of these parties are governed by the provisions of UCC article 9 (K.S.A. 84-9-101 *et seq.*). Our holding in this regard is governed by the reasoning set forth in *Atlas Industries, Inc. v. National Cash Register Co.,* 216

Kan. 213, 531 P.2d 41 (1975). See also *Citicorp Leasing, Inc. v. Allied Institutional, Etc.,* 454 F. Supp. 511 (W.D. Okla. 1977).

Defendants contend, however, that although the leases in this case were intended as security, the transactions also had aspects of sales of goods and that article 2 is therefore applicable. In support of this contention, defendants rely on K.S.A. 84-2-102, which defines the scope of article 2 and provides in part:

"Unless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate *only* as a security transaction . . . ." Emphasis added.

The Kansas comment to this section indicates the security aspects of a sales transaction are covered by article 9 and the general sales aspects of a secured transaction are governed by article 2.

While there were undoubtedly sales of goods in this case, the fallacy in defendants' argument is that the sales took place between defendants and SSS and plaintiff's only role in each transaction was to provide the funds with which defendants were able to purchase the equipment from SSS upon terms set forth in the lease agreements. There was a buyer-seller relationship between defendants and SSS with only a security interest in plaintiff.

However, defendants also argue that, because of CIT's knowledge of SSS's business practices and because the two were so closely aligned that SSS could be considered the agent of CIT, defenses good as against SSS would flow through as against CIT. They suggest that, when a financier like CIT has a voice in setting the policies and standards to be followed by a dealer like SSS, CIT should be considered a participant in the transaction and subject to defenses against SSS. Be that as it may, we find nothing in this record to indicate that CIT exercised any control whatsoever over the business affairs of SSS or had any voice in setting the policies and standards to be followed by SSS beyond apprising that company that, if its customers wanted to finance a purchase from SSS with funds provided by CIT, certain forms and instruments were to be completed in a particular manner and submitted, after which CIT would make the decision as to whether to provide funds for that purpose. SSS did not have authority to bind CIT in any transaction nor were SSS customers required to purchase on terms dictated by CIT.

What constitutes agency and whether there is any competent

evidence reasonably tending to prove the relationship is a question of law. However, the weight to be given evidence and the resolution of conflicts therein are functions of the trier of facts. *Henderson v. Hassur,* 225 Kan. 678, 682, 594 P.2d 650 (1979); *Highland Lumber Co.,Inc. v. Knudson,* 219 Kan. 366, 371, 548 P.2d 719 (1976); *Thurman v. Cundiff,* 2 Kan. App. 2d 406, 411-412, 580 P.2d 893 (1978). Where the relationship of principal and agent is in issue, the party relying thereon to establish his claim or demand has the burden of establishing its existence by clear and satisfactory evidence. *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, Syl. ¶ 1. Where the existence of an agency is disputed, its existence or non-existence is ordinarily a question of fact for the jury to be determined on proper instructions. *Graham v. Buesche,* 113 Kan. 530, Syl. ¶ 1, 215 Pac. 272 (1923); *Penland v. Barrett Co.,* 109 Kan. 269, Syl. ¶ 3, 198 Pac. 710 (1921). See PIK Civ. 2d 7.01 (1977).

In the case of *First National Bank of Denver v. Caro,* 211 Kan. 678, 508 P.2d 516 (1973), it was held:

"The test in determining the existence of agency so the doctrine of respondeat superior is applicable, is the right to control the servant." Syl. ¶ 2.

"When a bank directs a borrower to obtain the signature of another on a personal guaranty as a condition to making a loan, the act of the borrower in obtaining the signature is one for his own benefit and the borrower is not the agent of the bank." Syl. ¶ 1.

In this case, CIT merely required that, if SSS wished to obtain financing for its customers through CIT, it should do so by submitting the instruments required by CIT in the form prescribed. In doing so, SSS was acting for itself or for the benefit of its customers and not for the plaintiff. We find no evidence in this record reasonably tending to prove an agency relationship between CIT and SSS.

In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. *Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, Syl. ¶ 5, 589 P.2d 599 (1979); *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977); *Simpson v.*

*Davis,* 219 Kan. 584, Syl. ¶ 3, 549 P.2d 950 (1976); *Moore v. Francisco,* 2 Kan. App. 2d 526, Syl. ¶ 1, 583 P.2d 391 (1978); *Ellis v. Sketers,* 1 Kan. App. 2d 323, Syl. ¶ 4, 564 P.2d 568, *rev. denied* 225 Kan. 843 (1977). A motion for directed verdict may not be sustained unless the evidence is insufficient to support a verdict for the party against whom it is directed. *Gerchberg v. Loney,* 1 Kan. App. 2d 84, Syl. ¶ 5, 562 P.2d 464 (1977), *aff'd* 223 Kan. 446, 576 P.2d 593 (1978). In considering a motion for a directed verdict on an issue of fact, the trial court should not weigh conflicting evidence or consider the preponderance thereof. *Pickens v. Maxwell,* 203 Kan. 559, 562, 456 P.2d 4 (1969); *Springfield Tent & Awning Co. v. Rice,* 202 Kan. 234, Syl. ¶ 1, 447 P.2d 833 (1968).

Because there was a buyer-seller relationship between defendants and SSS, the warranty provisions of UCC article 2 which apply only to the seller are not applicable as against the plaintiff. K.S.A. 84-2-312, 313, 314, 315. Since the warranty provisions are inapplicable, the contention that plaintiff's disclaimer of warranty in the leases was unconscionable, as anticipated by K.S.A. 84-2-302, must likewise fail.

We conclude that the trial court did not err in granting plaintiff's motion for directed verdicts, in its ruling that UCC article 2 does not apply to the transactions here involved, or in denying defendants' motions for new trial.

Affirmed.