(627 P.2d 374)

No. 51,977

Evco Distributing, Inc., *Plaintiff-Appellee/Cross-Appellant,* v. Commercial Credit Equipment Corporation, *Defendant-Appellant,* v. Northwestern National Insurance Company of Milwaukee, Wisconsin, *Defendant/Cross-Appellee.*

Opinion filed May 1, 1981.

*William F. Kluge, III,* of Lambdin & Kluge, Chartered, of Wichita, for defendant-appellant.

*C. Stanley Nelson,* of Hampton, Royce, Engleman & Nelson, of Salina, for plaintiff-appellee/cross-appellant.

*Clarence L. King, Jr.,* of King, Stokes, Knudson & Nitz, Chartered, of Salina, for defendant/cross-appellee.

Before Justice Prager, presiding, Abbott, J., and J. Patrick Brazil, District Judge, assigned.

Prager, J.: This appeal involves a controversy between parties to a commercial tripartite finance lease. Lease transactions of this type involve three parties: (1) the supplier, (2) the financing agency as lessor, and (3) the buyer as lessee. Typically, a potential buyer will negotiate with the supplier for the purchase of certain equipment. In lieu of an outright purchase by the buyer, the supplier will sell the equipment to a third party, the financing agency. The financing agency, as lessor, in turn leases the equipment to the buyer, as lessee, for a period of time that is substantially the same as the useful life of the item. The buyer-lessee then makes rental payments to the lessor which are calculated to return

to the lessor the acquisition cost of the item plus interest. The use of tripartite finance lease arrangements has become quite common because of the tax advantage present in this form of financing.

In this case the supplier is the plaintiff-appellee, Evco Distributing, Inc. The financing agency-lessor is Commercial Credit Equipment Corporation (CCEC), the defendant-appellant. The buyer-lessee is Harmack Grain Company, Inc., which is not a party to this litigation. The defendant/cross-appellee is Northwestern National Insurance Company of Milwaukee, Wisconsin, which provided fire insurance coverage on the equipment to Evco. The controversy in this case arose because the equipment sold, a "Big A" fertilizer applicator worth about $40,000, was destroyed by fire while in the custody of the buyer Harmack. The basic issue in the case is whether Evco, the supplier, or CCEC, the lessor, must stand the loss of the equipment resulting from the fire.

The stipulated facts were essentially as follows: In 1976 and 1977, Evco's business included the sale of Big A fertilizer applicators manufactured by Rickel Manufacturing of Salina. CCEC was in the business of purchasing and leasing equipment to third parties. On January 5, 1976, Evco and CCEC entered into a Special Financing Agreement which was in full force and effect in April, 1977, when the sale was made in this case. The agreement provided, in substance, that CCEC was to finance equipment distributed by Evco, either by purchasing the purchase money security agreement or by purchasing the equipment and leasing it to the third party. Under the terms of this agreement, Evco was to arrange for the sale or lease. CCEC was to purchase leases upon request, if both the lessor and lessee were acceptable to it. If a lease was arranged, Evco was to deliver the equipment to the lessee. Upon the lessee's acceptance of the equipment, the lessee was to execute the leasing agreement for delivery to and execution by CCEC. Title to the equipment was to vest in CCEC at the time it purchased and received delivery of the lease.

On March 24, 1977, Harmack Grain Company, Inc., contacted Evco about the sale and financing of a Big A fertilizer applicator. At Evco's request, CCEC conducted a credit investigation of Harmack, which was favorable. On March 28, 1977, the CCEC regional manager approved the purchase of the Big A for $39,600

and its lease to Harmack for repayment of the purchase price at 14% interest over five years. The next day, *CCEC* prepared and forwarded to Evco the following four documents: The lease, two UCC financing statements, and a blank form of delivery receipt. Accompanying these documents was the following note from CCEC employee Betty Keil to Evco employee Dennis Rogers:

"Dennis—
"Here are the papers on Harmack—which has now been approved.
"Have a good day!

"Betty"

Rickel Manufacturing shipped and delivered the Big A applicator to Harmack in Cope, Colorado, on April 4, 1977. At that time, V. L. Sackett, who was Harmack's manager-secretary and acting within the scope of his authority, signed the lease, UCC forms, and delivery receipt prepared by CCEC. These documents were returned to Rickel's truck driver along with Harmack's check to CCEC for the first rental payment.

On April 5, 1977, an Evco employee went to Harmack to perform startup operations and give instructions for using the Big A. At this time, Harmack had received all the equipment and manuals necessary to use the equipment except the calibration or rate of application chart. At that time, Harmack's Marlin Sackett executed the Owner Warranty Registration and delivery report.

On April 6, 1977, Evco mailed to CCEC the lease, UCC financing statements, delivery receipt, an invoice indicating Evco had sold the Big A to CCEC and shipped it to Harmack Grain Company, Cope, Colorado, and Harmack's first rental payment. The cover letter addressed to CCEC's Keil from Evco's Rogers stated:

"This should complete the transaction and we will look forward to our remittance."

These documents were received by CCEC on April 8, 1977.

On April 6, 1977, the Harmack machinery shed, in which the Big A and other equipment were stored, was burned, destroying the Big A. The next day, April 7, 1977, V. L. Sackett called CCEC informing them of the destruction of the Big A and requesting them to forward the information to Evco. On April 13, CCEC returned to Evco the documents mailed April 6. That cover letter stated:

"On April 8, 1977, we received, from your company, the documentation for the Harmack Grain Company transaction. As you requested, the forms are being returned to you. It is our understanding that, because of a fire, a new transaction is in the making."

At the time of the fire, Harmack was insured by a policy with New Hampshire Insurance Group. The fire policy listed specific equipment which did not include the Big A in question. Evco's equipment was insured by Northwestern National Insurance Company. The property covered in the Northwestern National insurance contract included "property of the Insured and the property of others in the custody or control of the Insured. . . ." The policy specifically excluded "[p]roperty sold by or under encumbrance to the Insured after it leaves the custody of the Insured or an employee of the Insured (but this exclusion shall not apply to property in the custody of a carrier for hire for the purpose of delivery at the risk of the Insured)."

When CCEC refused to complete the lease and pay the Evco invoice, Evco sued, claiming that CCEC's purchase of the Big A was completed by the delivery to Harmack and that the risk of loss then shifted to CCEC. Alternatively, Evco sought recovery from Northwestern National under the terms of its policy. The issues agreed upon at the pretrial conference included:

1. Did Evco sell the Big A to CCEC and deliver it to Harmack at the designation and direction of CCEC?

2. If Evco did not so sell the Big A to CCEC can it recover against Northwestern under the insurance claim?

3. If Evco is entitled to recover against Northwestern, is Northwestern entitled to recover from CCEC?

The case was tried to the court, which made the following findings in addition to the stipulated facts:

"The commercial transaction out of which the suit arose is an ordinary one with three parties interested. The seller, the consumer and the supplier of the financing are all involved in such transactions with separate but related individual interests. In this case, CCEC, essentially a lender, elects to conduct its business as a buyer of the equipment and in turn leasing it to the consumer.

"The defendant, CCEC, denies that a sale of the equipment to it was completed and that the risk of loss had passed to it. The plaintiff has the burden to prove its claim in this regard is more probably true than not true.

"In addition, CCEC has asserted the defense of the statute of frauds. It has the burden on this defense.

"In addition to the stipulations, which are adopted, I find and conclude:

"That CCEC directed Evco to deliver the Big A to Harmack and to obtain

execution of a delivery receipt, a lease, two financing statements and a check from Harmack for the first rental;

"That the plaintiff delivered the Big A to Harmack as directed; That the lease and related documents were executed by authorized persons and are binding documents;

"That the Big A as delivered was conforming goods. The equipment as delivered was complete and ready to operate. The calibration chart was merely a set of directions for most effective use of the equipment. This operating information was readily obtainable if desired by an operator. The claim that lack of the chart made the goods nonconforming is found to be without merit;

"That the Big A was fully and completely delivered to the lessee as directed and that the risk of loss passed to the defendant buyer CCEC; that the buyer had the responsibility to satisfy itself as to lessee's insurance coverage or otherwise protect itself from loss in the manner it desired.

"I further find that CCEC's procedure manual is not controlling and not applicable under the facts and circumstances involved in this case and that paragraph 2 of the special financing agreement, Exhibit A, is not applicable under the facts and circumstances.

"I further find that CCEC has failed to sustain its burden of showing that enforcement of the sale agreement between plaintiff and itself is barred by the statute of frauds for lack of writing. I affirmatively find that the written signed documents involved in this transaction fully satisfy the requirement of a signed instrument in writing to comply with the statute.

"I further find, as specifically requested by the defendant, Northwestern, as follows:

" 'The Big A Fertilizer Applicator at the time of its loss was not in the custody of Evco Distributing, Inc., nor was it in the custody of a carrier for hire for the purpose of delivery at the risk of Evco Distributing, Inc. at the time it was destroyed by fire.' "

Based on these findings, the court found Evco entitled to judgment against CCEC for the purchase price of the Big A and dismissed the action against Northwestern National. CCEC appeals the court's findings and conclusions, and, in the event the decision is reversed, Evco cross-appeals the finding that Northwestern National was not liable under its insurance contract.

CCEC first contends that it should not bear the risk of loss, because it was not the purchaser of the equipment, but merely a financing agency for the third-party purchaser. CCEC seeks to avoid the risk of loss allocation under K.S.A. 84-2-509(1)(*b*) by claiming to be a financing agency outside the scope of Article 2, citing K.S.A. 84-2-102.

The pertinent provisions of the above statutes are as follows:

84-2-509. "(1) Where the contract requires or authorizes the seller to ship the goods by carrier

. . . .

"(b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery."

84-2-102. "Unless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers."

In support of the argument that the "sale" from Evco to CCEC was in fact a sale from Evco to Harmack, with CCEC supplying the financing, CCEC directs the court's attention to *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 218, 531 P.2d 41 (1975). In *Atlas,* defendant NCR, the supplier, sought to avoid UCC Article 2 warranties by claiming that the financing agency was the proper party defendant as lessor to the buyer-lessee under a purported lease. The court listed the factors it considered in concluding the "lease" was in fact a financing agreement and NCR, as seller, was subject to the Article 2 warranties. See also *CIT Financial Services, Inc. v. Gott,* 5 Kan. App. 2d 224, 615 P.2d 774, *rev. denied* 228 Kan. 806 (1980) (purchaser cannot avoid payment obligations to financial agency by asserting as defenses breach of Article 2 warranties). Unlike the defendants in *Atlas* and *CIT,* CCEC seeks to avoid UCC responsibility by denying the transaction was a lease. Cases holding Article 2 applicable to lease transactions do not extinguish the right of parties to sell goods for subsequent leasing, but only preclude parties to a sale from avoiding Article 2 application by hiding behind a sale disguised as a lease. See, *e.g., Redfern Meats v. Hertz Corporation,* 134 Ga. App. 381, 215 S.E.2d 10 (1975) (analogy to leases under 2-102 is to prevent merchants from dodging code requirements by selling goods under the guise of a lease depriving the consumer of the protections intended to be afforded to him under the code).

There is ample evidence to support the trial court's finding that the transaction involved a sale of equipment for subsequent lease to a third-party lessee rather than a financing agreement disguised as a lease. CCEC stipulated that it was in the business of purchasing and leasing such equipment to third parties. The lease and financing statements prepared by CCEC stated that the transaction was a lease rather than a security transaction. The

terms of the Special Financing Agreement between Evco and CCEC specifically provided that CCEC would either finance the equipment sales *or* purchase the equipment for lease to the third party. If equipment was purchased and leased, the unencumbered title to the equipment vested in CCEC.

It should also be noted that at the time of trial, CCEC did not deny the transaction was for the sale of equipment by Evco to CCEC, with CCEC to then lease the equipment to the designated third party. It denied only that the sale was completed. This issue was raised in CCEC's answer, but not included in the issues at pretrial. The issue of the nature of the transaction was not raised at trial and should not be interjected into the case on appeal. *Hoffman v. Hoffman,* 228 Kan. 290, 293, 613 P.2d 1356 (1980); *Holmquist v. D-V, Inc.,* 1 Kan. App. 2d 291, 563 P.2d 1112 (1977).

CCEC next challenges the trial court's conclusion that delivery of the Big A to Harmack, as lessee, constituted delivery to CCEC, completing the sale from Evco to CCEC. CCEC first argues that the delivery of the Big A without the calibration chart constituted delivery of nonconforming goods, so that the risk of loss remained with the seller, Evco, until there was either a cure or acceptance of the nonconforming goods under K.S.A. 84-2-510(1) (risk of loss remains on seller delivering nonconforming goods until cure or acceptance). CCEC claims the defect was not cured at the time the Big A was destroyed, and that it had not accepted the Big A at the time the Big A was destroyed. See K.S.A. 84-2-601 (buyer may reject, accept, or accept in part goods which "fail in any respect to conform to the contract") and K.S.A. 84-2-606 (buyer "accepts" goods after a reasonable opportunity to inspect by signifying the goods are conforming or that he will take them despite the nonconformity; fails to reject; or acts inconsistently with the seller's ownership). CCEC notes that it did not have notice of delivery until after the Big A was destroyed, and therefore could not have "accepted" it with the resultant shifting risk of loss. CCEC further argues that Harmack could not have been its agent authorized to receive delivery and "accept" nonconforming goods, because CCEC had no contact with Harmack until Harmack notified CCEC of the equipment's destruction. CCEC argues, alternatively, that the risk of loss during delivery remained on the seller until tender of delivery of the equipment shipped F.O.B. destination under 84-2-319(1)(*b*), and that tender

of delivery was not completed until the buyer was notified of delivery as required in 84-2-503(1).

K.S.A. 84-2-106(2) defines conforming goods as follows:

"(2) Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."

Cases interpreting this provision hold that nonconformity cannot be viewed as a question of quantity and quality of the goods alone, but of the performance of the totality of the seller's contractual undertaking. *Wilke, Inc. v. Cummins Diesel,* 252 Md. 611, 618, 250 A.2d 886 (1969); *Irrig. Motor v. Belcher,* 29 Colo. App. 343, 347, 483 P.2d 980 (1971); *Campbell v. Pollack,* 101 R.I. 223, 221 A.2d 615 (1966).

Under the facts of this case, the trial court correctly held that the absence of the calibration chart when the Big A was delivered did not make it nonconforming. Carl Graves, a former Evco employee, testified that he performed the startup and equipment demonstration on the Big A delivered to Harmack on April 5, 1977, the day after it was delivered. Graves made sure all the necessary equipment was attached to the machine, and that all parts were in working order. Graves testified that the missing calibration charts were necessary for the intended use of the machine. When it was discovered that the calibration chart was missing, Graves called Evco's service department and requested that the missing chart be mailed to Harmack immediately. He later attempted to get the proper calibration setting for Harmack by telephoning the Salina office, but he placed the call after business hours and no one answered. Graves testified that it was the information on the chart rather than the chart itself that was necessary, and that he informed Harmack's employees that they could call Evco's wats line to get the proper calibration setting and begin using the Big A immediately thereafter. Even though the chart necessary for the intended use of the Big A was not delivered with the machine, other sources were available for procuring that information, including a free phone call to Evco or asking any of the dealers in the area. Graves had ordered the chart to be mailed, so Evco had done all it could to deliver the Big A in compliance with the contract and the lease. Evco's performance complied with its overall contractual obligations to CCEC, and

the absence of the chart under these facts did not render the Big A either inoperable or nonconforming.

Even if Evco had delivered nonconforming goods, the risk of loss shifted to CCEC by Harmack's acceptance. The applicable Code provisions are as follows:

"84-2-510. **Effect of breach on risk of loss.** (1) Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."

"84-2-606. **What constitutes acceptance of goods.** (1) Acceptance of goods occurs when the buyer

"(*a*) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

"(*b*) fails to make an effective rejection . . . or

"(*c*) does any act inconsistent with the seller's ownership . . . ."

Under subsection (1)(*a*), acceptance may be either express or implied. One manifestation of the intent to accept either conforming or nonconforming goods is the tender of a check in payment for the goods. 2 Anderson, Uniform Commercial Code §§ 2-606:17, p. 194 and 2-606:25, p. 197 (2d ed. 1971). Under subsection (1)(*c*), acts inconsistent with the seller's ownership indicating acceptance include any alteration of the goods. See, *e.g., Bowen v. Young,* 507 S.W.2d 600 (Tex. Civ. App. 1974); *Brule C.E. & E., Inc. v. Pronto Foods Corp.,* 3 Ill. App. 3d 135, 278 N.E.2d 477 (1971).

The Big A was clearly "accepted" as contemplated by the contract. The Special Financing Agreement specifically stated that the equipment to be leased was to be delivered to the lessee and accepted by the lessee. The lessee was then to execute the lease for delivery to CCEC. There was testimony that CCEC had orally requested Evco to return executed leases with the first rental payment. Harmack's conduct was consistent with acceptance. Harmack expressly accepted the goods when Marlin Sackett signed the Owner Warranty and Delivery form, initialing the paragraph stating the equipment had been delivered in satisfactory condition, even after it was known the calibration chart was missing. Harmack impliedly accepted the Big A when V. L. Sackett signed the lease prepared by CCEC and returned it for delivery to CCEC with a check to CCEC for the first rental payment. There was also acceptance by Harmack by conduct inconsistent with Evco's ownership. There was testimony that when Graves arrived to perform the startup, a two-way radio had

been completely installed on the Big A by Harmack. Under these circumstances, Harmack did in fact accept the Big A from Evco.

CCEC's alternative argument, that the risk of loss remains on the seller, even in the absence of breach under 84-2-509 and 84-2-319(1)(*b*), because of lack of notice required by 84-2-503(1), is also without merit. CCEC argues that a contract which provides the seller will ship the goods F.O.B. destination places the risk of loss on the seller until there is proper "tender of delivery." K.S.A. 84-2-509 and 84-2-319(1)(*b*). CCEC claims improper tender because K.S.A. 84-2-503(1) requires for proper tender of delivery that the seller place conforming goods at the buyer's disposition and to give the buyer "any notification reasonably necessary to enable him to take delivery." As noted previously, the Evco-CCEC contract specifically provided that the equipment purchased by CCEC for leasing would be delivered to and accepted by the lessee. In the present case, lessee received delivery and accepted the possession of the Big A. See 84-1-201(14) (delivery means the transfer of possession of the goods) and 84-2-606 (acceptance).

CCEC next argues that there was no writing sufficient to satisfy the statute of frauds, K.S.A. 84-2-201. That statute provides in part:

"84-2-201. **Formal requirements; statute of frauds.** (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."

In *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.*, 205 Kan. 684, 689, 473 P.2d 18 (1970), the Supreme Court held that a writing may be sufficient to comply with the statute of frauds if the following three elements are found to exist:

(1) The writing must be evidence of a sale of goods;

(2) it must be signed or authenticated; and

(3) it must specify quantity.

The writing need not be a formal writing (see Kansas and Official UCC Comments) and may include several writings which are sufficient when considered together and are interrelated through incorporation by reference or physical attachment. 1 Anderson, Uniform Commercial Code, § 2-201:28, at p. 268 (2d ed. 1970).

The documents evidencing the sale in the present case include the following:

(1) The Special Financing Agreement signed by both Evco and CCEC.

(2) An interoffice memo confirming Evco's request for the prospective sale of the Big A to CCEC and lease to Harmack.

(3) The lease and UCC financing statements prepared by CCEC.

(4) CCEC's delivery receipt signed by V. L. Sackett for Harmack.

(5) The memo accompanying the documents prepared by CCEC and sent to Evco which stated that the Harmack lease had been approved and which was signed by a CCEC employee.

The Special Financing Agreement demonstrated the parties' intent that future sales would exist. Documents necessary for the sale and lease were prepared by CCEC and sent to Evco, with an accompanying memo acknowledging the sale which was signed by an agent of CCEC. The trial court's findings that the writing complied with the 84-2-201 Statute of Frauds is supported by substantial evidence.

CCEC next argues that the terms of the Special Financing Agreement obligate Evco to repurchase the remains of the Big A. Paragraph 2 of that agreement states:

"2. For each Calendar year, Undersigned shall repurchase from you 3 Units of Equipment designated by you, which you repossess or obtain possession of. 'Unit of Equipment' means all Equipment covered by Instruments acquired and Leases entered into by you in a Calendar Year with the same person as purchaser and/or Lessee, respectively."

Paragraphs 6 and 7 elaborate on the repurchase provision, and state:

"6. Undersigned will repurchase Units of Equipment described in paragraph 2, or such part thereof, as you designate, immediately upon your demand, in whatever condition and wherever located, and will pay you therefor, in cash . . . the total unpaid rental owing under the related Lease . . . . If Undersigned does not repurchase such repossessed Equipment, you may sell such Equipment at public or private sale, with or without notice to Undersigned . . . Undersigned will pay the difference between the net amount realized from such sale and the repurchase price for which Undersigned is obligated. Until repurchased by Undersigned, you may store repossessed Equipment on the premises of Undersigned without cost and the possession of such Equipment by Undersigned shall be merely as a bailee with the duty to safely store for you and redeliver to you such equipment on demand.

"7. Except for breach of any warranty provided herein, and Undersigned's

liability to repurchase as provided in paragraph 2 hereof, there shall be no liability upon Undersigned to repurchase . . . any Equipment covered thereby."

The terms of the contract clearly contemplate that Evco will repurchase equipment repossessed because of default on loan payments or repossession obtained because of lease termination. The contract further provides that Evco is only obligated to repurchase three units per year, and that the physical possession of repurchased equipment will be tendered to Evco. Such an interpretation is consistent with trial testimony that Evco, upon CCEC's request, had previously purchased equipment seized and delivered to Evco because leases were in default. See K.S.A. 84-2-202(*a*) (a written contract may be explained by the parties' previous course of dealing [84-1-205(1)] or course of performance [84-2-208]). Under the terms of the contract, and as understood and previously acted upon by the parties, Evco was only obligated to repurchase equipment which CCEC repossessed because of loan or lease defaults. The repurchase provision is inapplicable to the present issue of allocation of risk of loss.

CCEC next maintains that, under the terms of the Special Financing Agreement, it was justified in refusing to accept the lease and pay the purchase price of the Big A. As justification, CCEC notes that the Big A was not adequately insured as required by the CCEC Policy Manual and that the lease was not executed by lessee's president or vice president, again as required by the policy manual. At issue is whether the sale to CCEC was complete upon Evco's delivery of the equipment to the lessee and lessee's acceptance and execution of CCEC's documents, or whether CCEC has the ability to later reject the lease and decline to purchase the equipment because of procedural defects in the lessee's execution of the lease.

The relevant provisions of the Special Financing Agreement are as follows:

"1. From time to time, Undersigned will request you . . . to purchase from Undersigned equipment for leasing by you to lessees under leases hereinafter called "Leases," arranged by Undersigned of such equipment . . . such lessees and leases to be acceptable to you.

. . . . .

"4. Undersigned warrants to you . . . (ii) with respect to Leases, that clear and unencumbered title to such Equipment will be transferred to you at the time of your purchase thereof, that original Leases covering such Equipment will be delivered to you at the time of your purchase thereof, duly executed by the lessees

thereon with the lease terms commencing at such date, that such Equipment will have been delivered to and accepted by such lessees as satisfactory for the purposes leased  .  .  .  .

. . . .

"8. The provisions of the Agreement shall cover all Equipment and Instruments purchased by you from Undersigned, except that, as to particular transactions, Undersigned from time to time may specifically undertake additional obligations with respect to the related Instruments, Leases or Equipment, and as to any such transaction, such specific undertaking shall supersede and replace the provisions of this Agreement  .  .  .  ."

As to the insurance requirement, two documents reflect the necessity of procuring insurance before the commencement of the lease. CCEC's policy manual provides:

"10. Evidence is required that the equipment is insured against fire, theft and comprehensive damages and that the lessee has liability insurance for bodily injury and property damages.

. . . .

"12. The insurance company must be a company acceptable to CCEC.  .  .  .
"13. Leases may be purchased with evidence of insurance (phone call or written confirmation from Insurance Company) but a copy of the Policy, including a Loss Payable Clause, must be secured within a few days after purchase.
"Extreme care must be taken to see that these are received immediately and renewed at expiration date.  .  .  .
"14. All such insurance shall name CCEC and the User as the insured, and shall provide that the same may not be altered or cancelled except after 30 days prior written notice to CCEC, with losses being adjusted with and paid to CCEC."

The lease form used by CCEC and executed by Harmack states:

"10. Insurance
"10.1 User assumes all risks and liability for the maintenance, repair, use, operation and storage of all Units leased hereunder, and for injuries or deaths of persons and damage to property, howsoever arising from or incident to such maintenance, repair, use, operation or storage, whether such injury or deaths to persons be of agents or employees of User or of third parties, and whether such damage be to property of User or others.
"10.2 User shall provide adequate insurance against liability for bodily injury and property damage from the time a Unit is delivered to User until the Unit is sold and legal title passes to purchaser thereof.
"10.3 User shall provide adequate insurance against loss or damage to the Units due to risks insured against by a policy of fire, theft and comprehensive insurance.
"10.4 User shall deliver to CCEC, prior to the beginning of the lease term with respect to any Unit, prior to the effective date of any cancellation or expiration of such insurance, as the case may be, the insurance policy, a certificate or other evidence, satisfactory to CCEC, of the maintenance of the insurance required hereunder."

During the trial, Roger Wilbur, former president of Evco,

testified that Evco knew from prior verbal instructions that CCEC required the lessee to have insurance. John Roberts, assistant regional manager for CCEC, stated that CCEC gave only credit approval until the time the money was paid to the supplier and the lease approved and that, at that time, all signature and insurance requirements must have been met. *Roberts acknowledged that it was the responsibility of the customer/lessee to procure insurance and CCEC's responsibility to confirm the insurance.* Evidence was also presented of other leases which had been purchased by CCEC before confirmation of insurance coverage.

The only evidence of the signature requirement is found in CCEC's policy manual. Evidence was presented of other leases which CCEC had purchased even though executed by the lessee's secretary or manager rather than the president or vice president. The parties stipulated that Evco was unaware of the policy manual and its contents. It was also admitted at trial that rejection of the Harmack lease because of improper signature was not asserted until a year after the lease was originally rejected. See *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.,* 205 Kan. at 693 (justification for breach asserted months after breach was "primarily an afterthought, for use as an escape hatch").

Under the present set of facts, the risk of loss was properly determined to have rested with the buyer, CCEC, at the time the Big A was destroyed. The insurance and authorized signature requirements were not contained in the Special Financing Agreement or any other document to which Evco was bound. Evco had done all it was bound to do under the contract. It had requested the purchase and lease by CCEC. CCEC approved Harmack as lessee after a favorable credit investigation, and impliedly approved the lease it prepared and forwarded to Evco. After receiving approval, Evco delivered the Big A to Harmack who accepted delivery of the Big A, executing the necessary documents prepared and furnished by CCEC. Upon Evco's fulfilling its obligations under the contract, CCEC was obligated to fulfill its obligation to purchase the lease and pay Evco therefor. K.S.A. 84-2-301 (buyer's obligation is to accept and pay in accordance with the contract). As between Evco and CCEC, the trial court properly determined the risk of loss to have been on CCEC when the Big A was destroyed. K.S.A. 84-2-509.

The judgment of the district court and its findings of fact and conclusions of law are supported by the evidence. The cross-claim of Northwestern National, Evco's insurer, against CCEC is moot and need not be determined.

To summarize, our basic holding is this: This is a contract case where the rights of the parties must be determined by the terms of their agreement as contained in the contract documents and developed in their course of dealing. Evco delivered the Big A to Harmack with the consent of CCEC after Harmack signed all of the various documents furnished Evco by CCEC. Evco fully performed all acts required by its contract. If CCEC desired Evco to obtain insurance coverage from Harmack, it should have required that Harmack provide an insurance binder before delivery was made by Evco. It did not so require. Hence, CCEC must bear the risk of loss.

Judgment affirmed.