**CPC INTERNATIONAL, INC., Plaintiff,**

v.

**TECHNI–CHEM, INC., Defendant.**

**No. 85 C 1192.**

United States District Court,
N.D. Illinois, E.D.

May 26, 1987.

James W. Gladden, Jr., Mitchell D. Raup, Robert J. Kriss, and Hope G. Nightingale, Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

D. Patterson Gloor and Peter J. Borzeka, Cassiday, Schade & Gloor, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Before us are defendant Techni-Chem's motions for summary judgment on both counts of plaintiff CPC's amended complaint for breaches of warranty and contract. Although there was some question of our jurisdiction over this action, evidence submitted by the plaintiff establishes the diversity of citizenship of the parties. The parties agree that California substantive law governs.

In July 1983 CPC entered into a written contract to buy from Techni-Chem a system of equipment designed to process and refine fructose. The system consists of two "fractionators" and related equipment. The essence of a fractionator is an enclosed cylinder containing a resin. Corn syrup containing 42% fructose—that is, 42% by weight·of the solids in the syrup is fructose—is caused to flow through the resin. A syrup containing 70 to 90% fructose is recovered from the resin bed. This high purity fructose syrup is mixed with lower purity syrup to produce the end product, 55% fructose, which is used as a sweetener in many foods.

In the sales contract Techni-Chem warranted that the system could produce a certain minimum amount of 55% fructose per day. The section of the sales contract

labeled "Performance" contains the following language:

> TECHNI–CHEM, INC. guarantees to repair or replace on an expeditiously priority basis, free of charge, F.O.B. jobsite, any part of the equipment which fails within one (1) year of placing in operation, not to exceed eighteen (18) months from shipment, because of defective design, material, or workmanship with removal and return by purchaser.
>
> *This system is further guaranteed to be capable of producing a minimum of 640,000 pounds D.S. of 55% Fructose per day (24 hour basis) provided it is supplied with feed materials of the parameters listed below and operated in accordance with written instructions supplied with the system.*

Plaintiff's Exhibit 1 [Contract] at 16 (emphasis added). This provisional production guarantee is at the heart of the dispute surrounding one of Techni-Chem's motions for summary judgment.

Techni-Chem delivered the system to CPC's plant in Stockton, California, and in March 1984 operation of the two fractionators began. Although the system did produce 55% fructose, it was never able to meet the production guarantee, according to CPC. Techni-Chem personnel worked intermittently from March to December to bring the system into compliance, but without success. They left the CPC plant for the last time in December, 1984.

On February 7, 1985, CPC filed this action for breach of express warranty. CPC contends that due to defects in design, material, and workmanship, the system is incapable of meeting the production guarantee.[1]

In the meantime, CPC continued to use the system and brought in an outside consultant in an attempt to increase the system's rate of output. CPC replaced some of the system's equipment with equipment manufactured by a company other than Techni-Chem and it otherwise modified the system.

On June 12, 1985, CPC's counsel sent to Techni-Chem's counsel a letter which purported to revoke CPC's acceptance of the system and demanded a full refund of the purchase price. Nevertheless, CPC continued, and apparently still continues, to use the system. On June 21, 1985, we granted CPC leave to amend its complaint to add a second claim, in which CPC alleges that Techni-Chem breached the contract by tendering nonconforming goods.

Techni-Chem first challenges Count I—CPC's breach of warranty claim—arguing that the production guarantee in the contract is expressly conditioned upon CPC abiding by the parameters for feed material listed in the contract and the operating instructions provided with the system. It contends that CPC did not comply with the conditions and therefore the warranty never took effect.

■ CPC responds that the proviso which follows the performance guarantee in the contract was not a condition precedent, and it adduces evidence to support its position. Techni-Chem counters that we must interpret the contract provisions, including the guarantee and the proviso, based on the plain language of the contract, without the assistance of parol evidence.

Under California law, "the language of a contract is to govern its interpretation, if the language is clear and explicit." *Brandt v. Lockheed Missiles & Space Co.,* 154 Cal.App.3d 1124, 1129–30, 201 Cal.Rptr. 746, 749 (1984). If an ambiguity is apparent to the reader, extrinsic evidence is admissible to explain the terms of the written instrument. *Cordonier v. Central Shop-*

---

**1.** In its brief CPC contends that its amended complaint states a claim not only for breach of the production guarantee but also for breach of two other performance guarantees. Yet CPC's amended complaint refers to the other guarantees in the most indirect manner. It introduces only the production guarantee with the following language: "In the Contract, Techni-Chem guaranteed that the [system] would meet certain minimum performance standards, including but not limited to the following...." Amended Complaint ¶ 6. It does not otherwise mention the other guarantees. This is not sufficient to put Techni-Chem on notice that it would be defending against an action for breach of the other guarantees.

*ping Plaza Associates*, 82 Cal.App.3d 991, 1001, 147 Cal.Rptr. 558, 563 (1978).

The guarantee in the written contract contains at least two ambiguities. First, while the guarantee is clearly conditioned on compliance with the terms of the proviso, the contract does not identify the party to ensure compliance. Second, the proviso does not specify when and how often the parameters were to be satisfied. At one extreme, the proviso might mean that Techni-Chem guaranteed the production of 640,000 pounds of 55% fructose per day only if the system were always provided with feed which met the parameters. In its memorandum Techni-Chem appears to embrace this position, for it adduces evidence to show that the feed did not meet certain parameters a certain percentage of the time. At the other extreme, the proviso might mean that Techni-Chem bore the burden of proving that the system was capable of meeting the production guarantee, and therefore the guarantee took effect even if the system were never provided the proper feed. CPC argues for this interpretation.

Of course we must read the contract as a whole, and if other language in the contract clarifies the ambiguity in the guarantee, we may not look at parol evidence. The only other language in the contract which sheds light on the meaning of the guarantee occurs in two passages from two separate sections labeled "Services." The first one reads:

> The price of this equipment includes technical and engineering installation and startup supervision and service for a period of up to and including forty (40) man days. This service is based on two (2) men, twenty (20) days, and two (2) total trips for all items. This amount of service is normal to provide proper supervision for technical and engineering services during installation and startup of the equipment. Should additional time be required, through no fault of TECHNI–CHEM, INC., the additional time will be charged at our standard per diem of $375.00 per man per eight (8) hour day, plus travel expenses to the

jobsite from [Techni-Chem's principal place of business in] Belvidere, Illinois. Contract at 15.

This language is also not clear and explicit. If "engineering installation and startup supervision and service" include verifying that the feed meets parameters and that operating procedures are followed, then the guarantee might very well mean that Techni-Chem warranted it would make sure the system worked as promised before it handed the reins over to CPC. On the other hand, Techni-Chem's supervision may have been limited to its own equipment; CPC may have been responsible for supplying the appropriate raw materials and ensuring that the equipment was operated properly.

To add to the ambiguity, the other section of the contract labeled "Services" varies significantly from the first. It reads:

> The price of this equipment does not include supervision during erection or technical and engineering startup services. Should service time be required, through no fault of TECHNI–CHEM, INC., the time will be charged at our standard rate of $375.00 per man per eight (8) hour day, plus invoiced travel expense from Belvidere, Illinois, to Stockton, California, and return. TECHNI–CHEM, INC. recommends 10 days startup supervision.

Contract at 34–35.

Because the relevant portions of the contract are not clear and explicit, parol evidence is admissible to assist in their interpretation. If the evidence submitted upon this motion creates a genuine issue of material fact, summary judgment is inappropriate.

■ CPC's theory of the contract is that Techni-Chem agreed to provide startup services to CPC, and that part of Techni-Chem's obligation under the contract was to show "that the system was capable of meeting the performance guarantee." Plaintiff's Memorandum in Opposition to Motion for Summary Judgment as to Count I of the Amended Complaint at 7–8. According to CPC, startup usually takes only a few weeks, but Techni-Chem personnel

spent ten months trying to bring the system into compliance.

In its brief CPC claims that Techni-Chem personnel spent 3,000 man hours at CPC's Stockton plant, although it does not cite a particular piece of evidence which supports this assertion. Nevertheless, it is clear from the record that Techni-Chem personnel spent a great deal of time at CPC's plant. For example, a letter from Harold Keller, Techni-Chem's president, to R.H. Stormont, a CPC manager, refers to the presence of two Techni-Chem personnel at the Stockton plant for seven weeks from October to December 1984. Plaintiff's Exhibit 20.

There is also evidence that CPC did not pay Techni-Chem for the time its employees spent at CPC. Keller sent his letter to Stormont in December 1984, when Techni-Chem stopped working at CPC's plant. Keller offered Techni-Chem's continued services, but indicated that CPC would have to pay for them. The letter, which mirrors the language of the contract, reads:

> Should CPC wish to have TECHNI-CHEM, INC. provide additional technical and engineering services, these are available at our standard rates of $375.00 per day per eight (8) hour man day, plus travel expenses to the job site from Belvidere, Illinois.

*Id.* at 2. It seems unlikely that Keller would have included this paragraph in his letter had CPC previously been paying Techni-Chem for its time according to the terms of the contract. *See also* Deposition of Harold Keller at 134–37. Given the contractual language, quoted above, which states that the purchase price included at most forty free man days of installation and startup supervision by Techni-Chem, and that Techni-Chem would charge for additional time required through no fault of Techni-Chem, the implication that CPC did not pay Techni-Chem for the hours spent from March to December is further

evidence that Techni-Chem could not satisfy its contractual obligations without demonstrating compliance.

Another aspect of Keller's letter casts the same light on the meaning of the guarantee. Ostensibly the letter's purpose was to bill CPC for the last 10% of the purchase price—a retainer which CPC had been holding pending "completion of startup, and meeting performance guarantees." Contract at 38.[2] That Techni-Chem had not demanded the retainer earlier suggests that it felt it had the burden of meeting the performance guarantees, including the production guarantee at issue here, at least through December. The letter appears to pass the burden on to CPC; it suggests five areas of concern and states that correction of the problems in those five areas will result in the system being capable of obtaining the desired performance.

There is evidence in addition to Keller's letter which supports CPC's theory of the contract. For example, Gregg Willis, a CPC engineer who worked with the system at the Stockton plant, states in an affidavit that Techni-Chem employees were at the plant to demonstrate that the system was "capable of meeting the [Techni-Chem] performance guarantee"; that they "directed and observed all aspects of the operation of the [system] during their visits to Stockton"; that they "had access to all operating data ... and periodically reviewed this data"; that they "were suppose [sic] to contact me if they required assistance or information"; and that "CPC cooperated fully with [Techni-Chem] during 1984 in attempting to improve the performance" of the system. Affidavit of Gregg Willis ¶¶ 4–8. This too implies that Techni-Chem was in charge of the system until it proved that the system could meet the performance guarantees.

Thus there is evidence to support the proposition that satisfaction of the terms of the proviso by CPC was not a condition

---

**2.** The section of the contract labeled "PAYMENT TERMS" provides that 90% of the purchase price will be invoiced upon shipment, and that CPC would owe the final "10% of the sellingprice [sic] involved net thirty (30) days upon completion of startup, and meeting performance guarantees. If installation is delayed through no fault of Techni-Chem for 180 or more days from final shipment, retention will be due and payable." Contract at 38.

precedent to the production guarantee. For this reason, Techni-Chem is not entitled to summary judgment on Count I of the amended complaint.

Techni-Chem has also moved for summary judgment on Count II of CPC's amended complaint, which states a claim for breach of contract. The amended complaint alleges that the system did not meet the production guarantee, and that CPC revoked its acceptance of the system and demanded a full refund of the purchase price by letter dated June 12, 1985. Techni-Chem contends that CPC's purported revocation was ineffective and came too late, that CPC's post-revocation use of the system negated the revocation, and that CPC's alterations to the system prevented effective revocation.

A buyer may, under certain conditions, revoke its acceptance of nonconforming goods. Cal.Com.Code § 2608 (West 1964). "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." *Id.* § 2608(2).

Techni-Chem's first argument is that CPC did not provide it with sufficient notice of revocation. An essential element of a notice of revocation, Techni-Chem contends, is the buyer's offer to return the goods to the seller. CPC made no such offer. CPC responds that § 2608 does not require it to make such an offer.

Section 2608(2) requires the buyer to put the seller on notice of the buyer's revocation; it does not require more. In California, this represents a change from prior law.

> [Subsection 2608(2)] is similar to former Civil Code § 1789(3) (dealing with the buyer's conduct when he seeks recission).... [Subsection 2608(2)] differs in that the buyer need only give notice whereas under former Civil Code § 1789(3) to rescind the buyer was required "to return or to offer to return the goods to the seller."

*Id.* § 2608 California comment 5. CPC's letter notified Techni-Chem of CPC's revocation, and that was sufficient.

Techni-Chem next argues that CPC did not attempt to revoke acceptance within a reasonable period of time. CPC sent the letter of revocation about sixteen months after the system was installed at the Stockton plant. CPC responds that the determination of what was a reasonable time is a factual question inappropriate for summary judgment. We agree with CPC. There is evidence that Techni-Chem spent about ten months.attempting to bring the system into compliance with the performance guarantees, after which it left CPC with a list of suggestions for further remedial efforts. We cannot say as a matter of law that it was unreasonable for CPC to have devoted another six months to attempt to meet the guarantees before revoking acceptance.

Even if CPC's revocation was timely and proper, Techni-Chem argues, CPC's continued use of the system after June 12, 1985 invalidates the revocation. "A buyer who ... revokes has the same rights and duties with regard to the goods involved as if he had rejected them." *Id.* § 2608(3). "After rejection any exercise of ownership by the buyer ... is wrongful as against the seller." *Id.* § 2602(2)(a). CPC responds that its continued use was reasonable under the circumstances.

Whether the Uniform Commercial Code requires buyers to refrain from using goods after revoking acceptance, even where continued use would be economically reasonable, is a difficult question. It does not appear that the California courts have addressed the question yet. Of the cases from other jurisdictions, the ones which support CPC's position are better reasoned. In *Can-Key Industries, Inc. v. Industrial Leasing Corp.*, 593 P.2d 1125 (Or.1979); *Johannsen v. Minnesota Valley Ford Tractor Co.*, 304 N.W.2d 654 (Minn.1981); and *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 125 N.J.Super 251, 310 A.2d 491 (1973)—cases CPC cites—the courts expressly recognized the competing

concerns and balanced them. For example, the *Can-Key* court wrote:

> What constitutes "any act inconsistent with the seller's ownership" has proved to be one of the trouble areas under Article 2 of the Uniform Commercial Code.
>
> \*　\*　\*　\*　\*　\*
>
> A reasoned application of the section requires that the court recognize the existence of two competing policies. A buyer who verbally rejects goods should not in all cases be allowed to use the goods as if he were the owner and effectively "have it both ways." On the other hand, there are many cases in which use of the goods after rejection is not only reasonable in that it minimizes economic waste, but may be required under the buyer's statutory duty to mitigate consequential damages. *See* [U.C.C. § 2–715(2)(a) ]. The court must consider both policies when defining the scope of "any act inconsistent with the seller's ownership."

593 P.2d at 1131.

By contrast, the courts in *Hays Merchandise, Inc. v. Dewey*, 78 Wash.2d 343, 474 P.2d 270 (1970), and *Gigandet v. Third National Bank of Nashville*, 333 So.2d 557 (Ala.1976)—cases Techni-Chem cites—did little more than mechanically apply the rule that post-revocation use negates revocation, probably because in those cases a more reasoned approach would have produced the same result. The other cases Techni-Chem cites also do not grapple with the legal question before us. In *Fecik v. Capindale*, 54 Pa.D. & C.2d 701, 10 U.C.C. Rep.Serv. (Callaghan) 1391 (Ct.C.P.1971), the trial court made a finding of fact based on all the evidence. Similarly, in *Hutchinson Utilities Commission v. Curtiss-Wright Corp.*, 775 F.2d 231 (8th Cir.1985), and *Wadsworth Plumbing & Heating Co. v. Tollycraft Corp.*, 277 Or. 433, 560 P.2d 1080 (1977), the appellate court upheld the trial court's finding based on all the evidence. *World Wide Lease, Inc. v. Grobschmit*, 21 Wash.App. 537, 586 P.2d 889 (1978), simply does not apply.

The better reasoned cases stress that "avoidance of an absolute rule against continued use is counseled by the overriding requirement of reasonableness which permeates" the Uniform Commercial Code. *Fablok Mills*, 310 A.2d at 494. We agree. Where the buyer would incur large losses pending replacement of rejected nonconforming goods, the economic loss can be great if the buyer is required to stop using them, at least where the goods would have less value to the seller than to the buyer. One or both of the parties must eventually bear those losses. The code does not automatically require the buyer to abstain from using goods the acceptance of which the buyer has revoked, where doing so would unreasonably increase the buyer's damages resulting from seller's breach.

■ CPC presents evidence to show that this is a case in which post-revocation use averted large losses. The process of acquiring a fractionation system is a long one. For instance, the equipment at the Stockton plant began operation nine months after CPC and Techni-Chem executed their contract. The bidding and negotiation process which precedes execution of a contract adds to the lead time. While it is far from clear that CPC's continued use of the Techni-Chem system has been an interim measure pending the arrival of a replacement, the evidence is also not clearly to the contrary. Thus summary judgment is inappropriate.

■ Finally, Techni-Chem contends that CPC's modification of the equipment prevents CPC from revoking acceptance. CPC responds that the changes it made were necessitated by the goods' own defects. There is a genuine dispute over this material issue of fact as well.

Having denied Techni-Chem's motion for summary judgment, we turn to CPC's motion to file its second amended complaint which alleges additional breaches of warranty/contract. Because the case is not set for trial we will grant the motion. But plaintiff must assume the responsibility for delay in trial which attends the amendment.

## ORDER

Defendant's motions for summary judgment on Counts I and II of plaintiff's amended complaint are denied. Plaintiff's motion for leave to file second amended complaint is granted; defendant to answer in 21 days. Future scheduling will be on motion of the parties.