Argued January 5, reversed April 24,
petition for rehearing denied May 22, 1979

CAN-KEY INDUSTRIES, INC.,
*Respondent,*

*v.*

INDUSTRIAL LEASING CORPORATION,
*Appellant.*

(No. A 7609 12787, SC 25498)

593 P2d 1125

Ridgway K. Foley, Jr., Portland, argued the cause for appellant. With him on the brief were Elizabeth K. Reeve, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, and Clifford E. Nelson, Portland.

E. Richard Bodyfelt, Portland, argued the cause for respondent. With him on the brief were Peter R. Chamberlain and Bodyfelt & Mount, Portland.

Before Denecke, Chief Justice, and Holman, Howell and Lent, Justices.

HOWELL, J.

## HOWELL, J.

This is an action at law on a contract for the sale of goods. Plaintiff Can-Key Industries, Inc., manufactured a turkey hatching unit which it sold to defendant Industrial Leasing Corporation (ILC) which in turn leased it to Rose-A-Linda Turkey Farms, a California corporation. ILC's purchase order conditioned its final acceptance on Rose-A-Linda's willingness to accept the equipment. When Rose-A-Linda indicated that it was dissatisfied with the equipment, defendant refused to proceed with the contract of sale and plaintiff brought this action against ILC. From a judgment for plaintiff, defendant appeals.

### I

ILC is in the business of equipment leasing. Its customers order equipment from ILC, ILC purchases the equipment, and ILC then immediately leases the equipment to its customers.

In December of 1975, ILC sent plaintiff a purchase order for some turkey hatching equipment. The order was the first order plaintiff had to manufacture this type of turkey hatcher. The equipment consists in part of an insulated enclosure resembling a small room in which several large carts of trays hold turkey eggs. The carts turn on axes to simulate the activity of a mother turkey.

Prior to receiving the order, plaintiff had discussed the sale of a turkey hatcher with Rose-A-Linda. Rather than buying the equipment outright, Rose-A-Linda decided to lease the equipment through ILC. To protect itself from the possibility that, after purchasing the equipment, the equipment would prove unacceptable to its lessee, ILC included the following clause in its purchase order:

> "This order is conditioned upon your assurance that lessee has selected the equipment described above and will accept same on delivery. If lessee does not accept the equipment for any reason, we shall have no obligation hereunder, and you shall refund to

[175]

us all sums (including taxes, transportation charges and other charges) paid for or on account of the equipment."

The equipment was shipped to Rose-A-Linda in parts during January, February and March of 1976. On February 27, 1976, plaintiff sent an invoice to ILC stating that payment was to be made "immediate after acceptance" and that the equipment had been received by Rose-A-Linda.

Rose-A-Linda's president, Chester Gibson, testified that the first hatch came off on April 1. Gibson characterized the results as "a disaster" and said he immediately notified plaintiff that the equipment was unsatisfactory and asked that it be removed. Plaintiff replied by letter dated April 8, stating:

"* * * Although our philosophy on 'acceptance' and 'warranty' hasn't changed, in light of your new problems, please disregard our request for acceptance until we have solved your present problem."

The letter was signed by Gil Martini, plaintiff's president, and a copy was sent to defendant.

Martini and two of plaintiff's employees visited the Rose-A-Linda hatchery during the month of April in an attempt to remedy the problems with the equipment. All three testified that when they left the hatchery the equipment was in working order, variously described as "working," "in use," and "functioning satisfactorily." None of the three, however, testified that they witnessed the results of a hatch.

Gibson testified that after the first hatch came off, plaintiff's employees made some changes and Rose-A-Linda made three more sets. These sets, according to Gibson,

" * * * were likewise a disaster, and we had poor results.

"Then we wrote Mr. Martini and told him absolutely they were of no value to us, we wanted them removed. The fact is, we made a claim for damages

and wanted him to sustain and take care of damages he caused.

"* * * * *.

"Q (By Mr. Nelson) I presume—have you ever notified Industrial Leasing Corporation that you have accepted this thing?

"A I continually notified them they were unacceptable on numerous occasions.

"Q Are they in use today?

"A They are not in use. The hatcher has never been in use but one time. It was such a disaster. We have tried according to the manufacturer's recommendations. Since Mr. Martini and Can-Key Industries refused to remove the incubators, we notified them we wanted them removed so we could install additional equipment. They informed us they belonged to Industrial Leasing * * *."

Rose-A-Linda then employed Robert Cannon, the original developer of the turkey hatching equipment, to modify it. According to Gibson, the equipment was used four times in 1977. Eggs were set in the equipment on February 3, March 4, and April 3, each time following modifications or suggested modifications by Cannon. Gibson testified that each time the results proved unsatisfactory. The last set occurred on April 8 in order to make what Cannon termed "a complete comparative test." The resulting hatch occurred on May 6, 1977, and the equipment has not been used since.

## II

The sole issue in this case is whether defendant "accepted" the equipment manufactured by plaintiff. The contract between plaintiff and defendant provided that defendant's obligation to pay would be conditioned upon acceptance of the equipment by its lessee.[1] Consequently, the trial court could properly

---

[1] At one point in its brief, plaintiff suggests that the defendant's purchase order "was not the contract of sale." Plaintiff does not pursue this point, however, and we think there can be no question but that the purchase order embodied the terms of the contract between plaintiff and defendant. Plaintiff admitted as much when it alleged in its complaint that "Plaintiff accepted defendant's purchase order." *See* ORS 72.2010(3)(b).

find that defendant accepted the equipment only if there is evidence that Rose-A-Linda, the lessee, accepted the equipment.[2]

■ Plaintiff claims that under the terms of the contract between plaintiff and defendant the parties agreed that "acceptance" by Rose-A-Linda would occur upon delivery of the equipment at Rose-A-Linda's dock. Plaintiff notes that under ORS 71.1020(3), the provisions of the Uniform Commercial Code may be varied by agreement, and that the parties therefore could adopt a different standard for "acceptance" than that provided by the Code. Plaintiff also contends that whether or not the parties did adopt a different standard is a question of fact on which the trial court "could have found" in favor of plaintiff.[3]

We agree that had the parties wished to do so, they could have agreed that acceptance by Rose-A-Linda would occur upon delivery. We do not agree, however, that there is evidence from which the trial court could have found such an agreement. It is clear, both from a review of the testimony and an understanding of the

_____

[2] Both plaintiff and the trial court appear to have assumed that defendant's acts as lessor could constitute an acceptance irrespective of Rose-A-Linda's acceptance. Plaintiff suggests in its brief that the mere fact that defendant leased the equipment to Rose-A-Linda demonstrates an acceptance, while the trial court in its "letter opinion" suggested that defendant's "allowing its lessee to retain the product up to the time of trial" constituted an acceptance.

The error in these positions is that they ignore the fact that the parties *expressly* agreed that defendant's obligation to pay would be conditioned upon acceptance of the equipment by Rose-A-Linda. The Code provisions do not control over the express agreement of the parties unless that agreement is manifestly unreasonable. ORS 71.1020(3). We do not consider the above condition unreasonable in any respect.

[3] It is clear that this is not *in fact* the reason the trial court found in favor of plaintiff. Although the trial court entered only general findings of fact and conclusions of law, the court stated in a letter opinion to the parties:

"* * * * *.

"Defendant's allowing its lessee to retain the product up to the time of trial appears to me to constitute an acceptance of the plaintiff's product under ORS 72.6060(1)(c).

"Accordingly, Mr. Bodyfelt should prepare a judgment for the sum of money prayed for in the complaint."

[178]

nature of defendant's business, that the clause requiring acceptance by the lessee was inserted to protect defendant from the possibility that it would be required to purchase equipment that its lessee would be entitled to reject. This purpose would be completely frustrated if defendant became bound to purchase the equipment the moment it arrived at the lessee's dock and before the lessee had an opportunity to put it into operation and test it. To construe the agreement in the manner contended for by plaintiff would render the requirement of "acceptance" meaningless.

The only evidence plaintiff points to in support of its construction of the contract is the fact that the lease between defendant and Rose-A-Linda ran from the date of delivery and the fact that defendant's sales manager told Mr. Martini, plaintiff's president, that acceptance would occur when the equipment arrived at lessee's dock. An examination of the testimony concerning the discussion between Martini and the sales manager, however, reveals that the discussion concerned the *time* of payment from defendant to plaintiff, not the underlying obligation to pay. Similarly, the fact that the lease was to run from date of delivery merely means that Rose-A-Linda's payment obligations would begin on that date if the equipment were accepted.

For these reasons, we hold that there is no evidence from which the trial court "could have found" that the parties intended that Rose-A-Linda's acceptance would occur so as to bind defendant when the equipment was delivered. We must therefore review the record to determine whether there is evidence from which the trial court could have found that Rose-A-Linda accepted the goods within the meaning of the Uniform Commercial Code.

### III

ORS 72.6060(1) provides:

"Acceptance of goods occurs when the buyer:
"(a) After a reasonable opportunity to inspect the

goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

"(b) Fails to make an effective rejection as provided in subsection (1). of ORS 72.6020, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

"(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

No contention is made that ORS 72.6060(1)(a) is applicable in this case. There is absolutely no evidence that Rose-A-Linda ever signified that the turkey-hatching equipment was conforming or that it would retain the equipment in spite of its nonconformity. Plaintiff does contend, however, that the trial court could have found that there was an acceptance under the terms of ORS 72.6060(1) (b) or (c). The applicability of these subsections will be considered separately.

## A

Plaintiff argues that the trial court "could have found" that defendant failed to make an effective rejection and that acceptance therefore occurred under the terms of ORS 72.6060(1)(b).[4] Plaintiff notes that the equipment was first in use on March 3, 1976, and it was still in use as late as May 6, 1977. Plaintiff concludes that the trial court "could readily have found that 15 months was an unreasonable time to make a rejection."

Plaintiff's position can only be sustained if we ignore the uncontradicted testimony of Mr. Gibson, Rose-A-Linda's president. As noted above, Gibson testified that he twice notified plaintiff that the equipment was unacceptable and asked that it be removed. Plaintiff does not, and we think could not, contend that no effective rejection occurred under

---

[4] Again we note that it is clear from the trial judge's letter opinion, see note 3, supra, that he did not *in fact* find in favor of plaintiff for this reason.

Gibson's version of the facts.[5] Rather, plaintiff contends that the trial court was free to disregard Gibson's testimony and find that Rose-A-Linda retained the turkey hatching equipment for 15 months without objection.

It is true that in most cases the trier of fact is the exclusive judge of the credibility of witnesses. We have recognized, however, that in some cases, the law may require that the factfinder accept certain testimony as true. *Rogers v. Hill,* 281 Or 491, 576 P2d 328 (1978); *Rickard v. Ellis,* 230 Or 46, 368 P2d 396 (1962). The correct rule originally was stated in *Ferdinand v. Agricultural Insurance Co.,* 22 NJ 482, 126 A2d 323, 62 ALR2d 1179 (1956), and was adopted by this court in *Wiebe v. Seely, Administrator,* 215 Or 331, 335 P2d 379 (1958):

> " '* * * Where men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury. * * * [Citing cases]. But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinary intelligent mind, then a question has been presented for the court to decide and not the jury. * * * [Citing cases].' " 215 Or at 343-44.

After a careful review of the record in the present case, we have concluded that under the cases cited above the trial court, contrary to the position taken by plaintiff, could not have disregarded Gibson's uncontradicted testimony regarding his objections to the equipment. Although Gibson may have had some interest in the

---

[5] Under the facts as related by Gibson, Rose-A-Linda notified plaintiff that the equipment was unacceptable immediately after the first hatch came off. Under ORS 72.6060(1)(b), Rose-A-Linda was not required to reject until it had "a reasonable opportunity to inspect the goods." *See* note 7, infra.

outcome of the present case, his testimony was neither "incredible" nor "extraordinary." Most importantly, plaintiff offered no evidence to contradict Gibson's claim that he notified plaintiff the equipment was unsatisfactory and asked that it be removed. Martini, who testified at trial, did not deny that Gibson had contacted him, and plaintiff did not so contend at trial. In fact, plaintiff's letter of April 8 expressly acknowledged Rose-a-Linda's "problems" with the equipment.

In these particular circumstances, we hold that the uncontradicted testimony of Gibson is conclusive of the facts involved in this issue. *See Foster v. Agri-Chem, Inc.*, 235 Or 570, 575-76, 385 P2d 184 (1963). We further hold that Gibson's statements constituted an "effective rejection" as that term is used in ORS 72.6060(1)(b). Plaintiff's evidence that Rose-A-Linda accepted the equipment is therefore sufficient only if it shows that Rose-A-Linda performed acts inconsistent with the seller's ownership under the terms of ORS 72.6060(1)(c).[6]

## B

What constitutes "any act inconsistent with the seller's ownership" has proved to be one of the trouble areas under Article 2 of the Uniform Commercial Code. Courts that have applied the provision have reached inconsistent results and commentators have termed the provision an "obstreperous" one. J. White and R. Summers, Uniform Commercial Code 251 (1972). *See generally,* Comment, *Buyer's Continued Use of Goods After Revocation of Acceptance Under the*

---

[6] Defendant argues that the application of ORS 72.6060(1)(c) is inappropriate in this case and that the proper statute is ORS 72.6020(2)(a), which provides that after rejection, any exercise of ownership by the buyer is wrongful as against the seller. It may be that there is a certain degree of overlap between the two statutes, but we think that when the issue is whether or not there has been an "acceptance" it is appropriate to proceed under ORS 72.6060(1)(c), as that statute defines "acceptance." The Comments to that section indicate that it contemplates acts following a rejection by the buyer. Oregon's Uniform Commercial Code § 72.6060, Comment 4 (1963). *See also Jorgensen v. Pressnall*, 274 Or 285, 545 P2d 1382 (1976); J. White and R. Summers, Uniform Commercial Code 252 (1972).

*Uniform Commercial Code*, 24 Wayne L Rev 1371 (1978); Annot., Use of Goods by Buyer as Constituting Acceptance under UCC § 2-606(1)(c), 67 ALR3d 363 (1975). It has been suggested that "courts are first deciding upon the merits of the buyer's claim and then reasoning backwards to the determination of whether there has been an acceptance because of an inconsistent act." White & Summers, supra at 253.

■ A reasoned application of the section requires that the court recognize the existence of two competing policies. A buyer who verbally rejects goods should not in all cases be allowed to use the goods as if he were the owner and effectively "have it both ways." On the other hand, there are many cases in which use of the goods after rejection is not only reasonable in that it minimizes economic waste, but may be required under the buyer's statutory duty to mitigate consequential damages. *See* ORS 72.7150(2)(a). The court must consider both policies when defining the scope of "any act inconsistent with the seller's ownership."

■■ It should be apparent from this that the conclusions reached by the finder of fact in cases involving ORS 72.6060(1)(c), contrary to plaintiff, are not necessarily binding on appeal. That the application of a statute requires an examination of the facts does not make the matter a "question of fact" in all cases. Professor Jaffee has observed that where a word of common meaning is used in a statute,

> " * * * judges are tempted to argue that the application of the word involves a purely factual finding, and is therefore not subject to the judicial control which is appropriate to conclusions of law. It soon appears, however, that this analysis is insufficient. Words, particularly common ones, rarely have a single meaning, and disputes inevitably arise as to whether a given word does or does not describe the phenomenon in question. In such a situation the dispute must be resolved by reference to the purposes of the statute and the question is thus one of law." Jaffee, *Judicial Review: Question of Law*, 69 Harv L

[183]

Rev 239, 243-44 (1955). *See also McPherson v. Employment Division,* 285 Or 541, 591 P2d 1381 (1979) (discussing this problem in the context of judicial review of administrative action).

■ In the present case we are called upon to determine whether certain acts constitute acts inconsistent with the seller's ownership under ORS 72.6060(1)(c). The material facts relevant to this issue are largely undisputed. There is, however, a dispute over whether these facts come within the intended application of ORS 72.6060(1)(c). This dispute "must be resolved by reference to the purposes of the statute and the question is thus one of law." Our scope of review, therefore, is not limited by the "any evidence" standard enunciated above, which is the standard for appellate review of factual determinations.

■ Nearly all the evidence plaintiff relies upon to demonstrate that Rose-A-Linda performed acts inconsistent with plaintiff's ownership was provided by Gibson, Rose-A-Linda's president. Plaintiff did introduce testimony that Rose-A-Linda used the equipment in March and April of 1976, but it is clear from the record that these uses related to Rose-A-Linda's initial inspection of the equipment and plaintiff's efforts to solve the "problems" with the equipment that it recognized in its April letter to Rose-A-Linda. Neither of these uses was inconsistent with plaintiff's ownership of the equipment. Rose-A-Linda's initial inspection cannot be considered inconsistent with plaintiff's ownership because ORS 72.6060(1)(b) assures a buyer of goods a "reasonable opportunity to inspect the goods."[7] Nor can the use of the equipment during April be considered inconsistent, because that use was approved by plaintiff, which was attempting to solve the problems with the equipment.

---

[7] There is no evidence in the record to show that Rose-A-Linda's initial inspection exceeded any limits of commercial reasonableness, and plaintiff does not so contend. In fact, plaintiff implicitly recognized in its letter of April 8 that Rose-A-Linda's initial testing of the equipment had not constituted an acceptance.

■ Plaintiff's primary reliance is on the modifications and alterations performed by Rose-A-Linda "after the equipment was installed and functioning." These acts all occurred after Gibson notified plaintiff that the equipment was unacceptable and asked that it be removed. The only testimony concerning these acts is Gibson's. That testimony shows that Rose-A-Linda employed the original developer of the equipment in an attempt to remedy the defects. It used the equipment four times during 1977. Three of those uses followed modifications or suggestions for modifications by the developer, and the final use was for the purpose of conducting a comparative test. Although the equipment apparently remains in Rose-A-Linda's possession, it has not been used since May of 1977.

We hold that this evidence does not demonstrate a use inconsistent with the seller's ownership under the terms of ORS 72.6060(1)(c). To hold otherwise would have the effect of penalizing Rose-A-Linda for its apparent good faith efforts to cure the defects in the equipment. We do not believe such a holding is compelled by the language of ORS 72.6060(1)(c). On the contrary, we think such a holding might be inconsistent with other provisions of the Code, specifically the statutory duty to mitigate consequential damages and the statutory obligation of good faith. ORS 72.7150(2)(a), 71.2030.[8]

It must be remembered that this transaction involved a newly developed product, the first of its kind manufactured by plaintiff. All parties to the transaction undoubtedly expected that the equipment would

___

[8] ORS 72.7150(2)(a) provides:

"(2) Consequential damages resulting from the seller's breach include:

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;

* * *"

ORS 71.2030 provides:

"Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement."

have some initial "bugs." After an initial test, Rose-A-Linda found the equipment unsatisfactory and notified plaintiff to that effect. Plaintiff then attempted to remedy the problems, and Rose-A-Linda again found the equipment unsatisfactory. Rose-A-Linda asked plaintiff to remove the equipment and plaintiff refused. Plaintiff did not instruct Rose-A-Linda to refrain from using the equipment, and plaintiff has not demonstrated that Rose-A-Linda's testing and modifications damaged the equipment in any way.

The Official Comments to Oregon's Commercial Code state that courts should avoid "the pinning of a technical 'acceptance' on a buyer who has taken steps toward realization on or preservation of the goods in good faith," and that a rejecting buyer should be afforded "all reasonable leeway" in dealing with goods in the absence of instructions from the seller.[9] Viewing the evidence in the present case in a light most favorable to the plaintiff, we nevertheless conclude that, as a matter of law, Rose-A-Linda did not perform any act inconsistent with plaintff's ownership within the meaning of ORS 72.6060(1)(c). *See Jorgensen v. Pressnall*, 274 Or 285, 545 P2d 1382 (1976) (continued occupancy of mobile home held not inconsistent with

[9] The Official Comments to ORS 72.6060(1)(c) state that the provisions of that statute

"are subject to the sections dealing with rejection by the buyer which permit the buyer to take certain actions with respect to the goods pursuant to his options and duties imposed by those sections, without effecting an acceptance of the goods." Oregon's Uniform Commercial Code § 72.6060, Comment 4 (1963).

The section referred to in the Comment, ORS 72.6040, provides:

"Subject to the provisions of ORS 72.6030 on perishables if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in ORS 72.6030. Such action is not acceptance or conversion."

seller's ownership). *Cf., Wadsworth Plumbing v. Tollycraft Corp.*, 277 Or 433, 560 P2d 1080 (1970) (use of pleasure boat for fishing trips up until time of trial held to constitute an acceptance); *Martin v. McCaige*, 261 Or 99, 492 P2d 770 (1972) (use of motor and pump to irrigate property held to constitute acceptance).

Because there is no evidence that Rose-A-Linda ever accepted the equipment in this case, the judgment against the defendant Industrial Leasing must be reversed.

Reversed.

---

The Comment to ORS 72.6040 provides in part:

"The basic purpose of ORS 72.6040 is twofold: on the one hand it aims at reducing the stake in dispute and on the other at *avoiding the pinning of a technical 'acceptance' on a buyer who has taken steps towards realization on or preservation of the goods in good faith.* * * *

"ORS 72.6040 is designed *to accord all reasonable leeway to a rightfully rejecting buyer acting in good faith.* The listing of what the buyer may do in the absence of instructions from the seller is intended to be not exhaustive but merely illustrative." Oregon's Uniform Commercial Code § 72.6040, Comment (1963). (Emphasis added.)