887 F.2d 1128
 58 USLW 2256, 9 UCC Rep.Serv.2d 1169
 MIDWEST PRECISION SERVICES, INC., Plaintiff, Appellant,
v.
PTM INDUSTRIES CORPORATION, et al., Defendants, Appellees.
MIDWEST PRECISION SERVICES, INC., Plaintiff, Appellee,
v.
PTM INDUSTRIES CORPORATION, Defendant, Appellee.
Appeal of SHAWMUT BANK OF BOSTON, N.A., Defendant.
 Nos. 89-1084, 89-1176.
 United States Court of Appeals,
First Circuit.
 Heard June 6, 1989.
Decided Oct. 18, 1989.
 
 Philip W. Mueller with whom Toni G. Wolfman, Annemarie Hassett and Foley, Hoag & Eliot, Boston, Mass., were on brief, for plaintiff, appellant.
 Robert D. Canty with whom Jaclyn McKenney and Csaplar & Bok, Boston, Mass., were on brief, for Shawmut Bank of Boston, N.A.
 Before CAMPBELL, Chief Judge, SELYA, Circuit Judge, and CAFFREY,* Senior District Judge.
 LEVIN H. CAMPBELL, Chief Judge.
 
 
 1
 A federal district court jury found that Shawmut Bank of Boston, N.A. (Shawmut), the lessor in a tripartite leasing transaction, broke its contract with a supplier when Shawmut's lessee wrongfully rejected the supplier's goods. Shawmut appeals, arguing that its minimal role in the three-party transaction, as well as the express language of its contract with the supplier, absolves it of any liability. Midwest Precision Services, Inc. (Midwest), the supplier, also appeals, claiming that the district court erroneously instructed the jury against duplicating damages and requesting, among other things, that this court quadruple the damages awarded below against Shawmut. Midwest further contests the district court's dismissal of its claims under Mass.Gen.Laws Ann. ch. 93A. We affirm in part, reverse in part, and order a new trial on the issue of breach of contract damages only.
 
 I.
 
 2
 In October of 1982, a salesman representing Midwest, an industrial machinery distributor based in Illinois, met with employees of PTM Industries Corporation (PTM), a machine shop business located in Westfield, Massachusetts. They discussed PTM's possible purchase of Midwest's crush and creep feed grinder (the machine), a computer-driven industrial grinder utilized for sophisticated metal grinding tasks. During these early discussions, Midwest tentatively offered to customize the machine to suit PTM's needs in exchange for $345,500.
 
 
 3
 PTM then turned to Shawmut for assistance. Shawmut and PTM discussed four financing options: (1) a short term loan; (2) a long term loan; (3) a fair market value lease; or (4) a dollar option lease. On November 8, 1982, PTM and Shawmut entered into a dollar option lease (the lease), in which Shawmut agreed to lease the machine to PTM for a period of 60 months, at the end of which PTM could buy the machine from Shawmut for one dollar.
 
 
 4
 On the next day Shawmut issued Midwest a purchase order for the machine. Shawmut's purchase order, the complete text of which is reproduced in the Appendix, included the following terms. First, the purchase order constituted the "complete and exclusive statement of the agreement" between Shawmut and Midwest. Second, Shawmut promised to pay Midwest $345,500 for the machine. Third, Midwest agreed to ship the machine directly to PTM. Fourth, Midwest expressly warranted the machine, providing both Shawmut and PTM with the right to enforce all applicable warranties. Finally, Shawmut indicated that it would have no liability and could cancel the purchase order unless within 90 days Midwest had delivered the machine and Shawmut had received from PTM a "signed acceptance certificate" acknowledging receipt of the machine in good condition and requesting payment of Midwest's invoice.
 
 
 5
 Midwest received and read Shawmut's purchase order, but it never received nor was it ever aware of the terms of the lease between Shawmut and PTM. After modifying the machine to meet PTM's requirements, Midwest shipped the machine to PTM. On January 25, 1983, the machine arrived at PTM's Westfield plant. Upon inspection, however, PTM immediately complained to Midwest that the machine was damaged and declared that it would not accept delivery. Midwest made repeated offers to cure any damage, irrespective of its nature or cause, but PTM steadfastly rejected Midwest's proposals.
 
 
 6
 During this time, Midwest kept Shawmut informed of the situation. On February 17, 1983, 101 days after Shawmut's issuance of the purchase order, Shawmut notified Midwest that it was cancelling their agreement.
 
 
 7
 On May 23, 1983, Midwest brought suit against PTM in the United States District for the Northern District of Illinois, alleging claims in contract and tort. PTM filed a motion to dismiss, or in the alternative, to transfer the case to Massachusetts, asserting that Shawmut, not PTM, was the "real party in interest" because Shawmut had issued the purchase order. On November 30, 1983, the case was transferred to the District of Massachusetts pursuant to 28 U.S.C. Sec. 1404(a).
 
 
 8
 On February 22, 1984, Midwest amended its complaint to include Shawmut as a defendant. The amended complaint included the following claims: (1) breach of contract against PTM; (2) breach of contract against Shawmut; (3) tortious interference in Midwest's contractual relations with Shawmut against PTM; and (4) unfair and deceptive conduct under Mass.Gen.Laws Ann. ch. 93A against both defendants. PTM brought counterclaims against Midwest for (5) breach of contract and (6) misrepresentation.
 
 
 9
 At the end of the eight day jury trial, the district court dismissed Midwest's claims under 93A and instructed the jury on claims (1), (2), (3), (5) and (6). With regard to Midwest's breach of contract claim against Shawmut (claim two), the court told the jury that Shawmut's purchase order constituted a contract between Shawmut and Midwest, and that in that contract Shawmut had delegated to PTM its duty to accept the machine or permit cure. The court further told the jury that if it found that PTM acted unlawfully or unreasonably in rejecting the machine or refusing to permit cure, it could find that Shawmut breached its contract with Midwest.
 
 
 10
 On Midwest's breach of contract claim against PTM (claim one), and the latter's counterclaim (claim five), the court instructed the jury first to decide whether a separate contract existed between PTM and Midwest. If one existed, then the jury could find PTM liable for any unlawful or unreasonable rejection of the machine or, conversely, it could find Midwest liable for supplying defective goods and failing to make legally adequate offers to cure.
 
 
 11
 After also instructing the jury on Midwest's tortious interference claim against PTM (claim three), and PTM's counterclaim for misrepresentation against Midwest (claim six), the court turned to damages. The court cautioned the jury "to be sure not to duplicate any damages you feel should be awarded" to either party. The court then presented the jury with a special verdict form comprising fourteen questions.
 
 
 12
 The jury's responses were favorable to Midwest and adverse to Shawmut and PTM on every claim and counterclaim. On claim one, the jury found that Shawmut caused Midwest $52,339.50 in damages when it breached its purchase order contract. On claim two, it found that PTM caused Midwest $157,018.50 in damages (three times the amount awarded against Shawmut) when it breached its separate contract. The special verdict form further stated that each defendant's contract violation occurred on January 25, 1983, the day PTM rejected the machine. On claim three, the jury found that PTM caused Midwest $2,807.55 in damages when it tortiously interfered with Midwest's contractual relations with Shawmut.
 
 
 13
 The district court denied the parties' post-trial motions and entered judgment, from which both Midwest and Shawmut appeal. PTM, which is apparently insolvent, has not appealed. The appeals raise a number of issues, which we now address.
 
 II.
 
 14
 The district court found that Shawmut was a "buyer" under Massachusetts law. See Mass.Gen.Laws Ann. ch. 106, Sec. 2-103(1)(a) (defining "buyer" as "a person who buys or contracts to buy goods."). Shawmut maintains that its role in the three-party transaction was that of a mere financing agent, not a buyer, and that therefore the district court erred in entering judgment against Shawmut for breach of contract. We reject Shawmut's argument.
 
 
 15
 The tripartite structure of the present transaction is not uncommon. Commercial leasing arrangements often involve three parties: (1) the supplier of the goods (Midwest); (2) the lessee (PTM), who chooses the supplier and selects the goods; and (3) the lessor (Shawmut), who supplies the money necessary to purchase the equipment. See Boss, Panacea or Nightmare? Leases in Article 2, 64 B.U.L.Rev. 39, 57-58 (1984); Mooney, True Lease or Lease "Intended as Security"--Treatment by the Courts, in 1C P. Coogan, W. Hogan, D. Vaghts & J. McDonnel, Secured Transactions Under the Uniform Commercial Code Sec. 29A.03. As in this case, the lessor is often a bank which performs a limited role in the transaction:
 
 
 16
 The bank performs no procurement functions. The [lessee] chooses the property he wishes to lease, selects a vendor and negotiates with him the terms of the purchase. Assuming the bank finds the [lessee] an acceptable credit risk, it then purchases the property and leases it to the consumer. Delivery by the seller is made directly to the customer-lessee who makes the lease payments to the bank.
 
 
 17
 M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377, 1380-81 (9th Cir.1977), cert denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Thus the standard tripartite transaction comprises two related exchanges. First, the bank purchases the equipment from the supplier. Second, the bank leases that equipment to the lessee, often through some form of "dollar option lease," in which the bank retains title to the equipment for the duration of the lease term but then transfers title to the lessee for nominal consideration at the end of the term.
 
 
 18
 The presence of three parties and two related exchanges complicates the analysis of the rights and duties between any two parties in the transaction. For example, if PTM (the lessee) sued Shawmut (the lessor) for breach of warranty, a court would have to examine carefully the terms of Shawmut's lease with PTM to determine, among other things, whether Shawmut should be characterized as a "merchant lessor" or a "finance lessor." See, e.g., Patriot General Life Ins. v. CFC Inv. Co., 11 Mass.App.Ct. 857, 420 N.E.2d 918, 921 (1981). See generally Boss, 64 B.U.L.Rev. at 67-72 (discussing lessor/lessee warranty issue). Although Shawmut persuasively argues that it was a "finance lessor" in relation to PTM, this issue is immaterial in the present case because no claim by PTM against Shawmut is before us.
 
 
 19
 The issue, rather, is Shawmut's status vis-a-vis Midwest. That status is defined by the purchase order issued by Shawmut to Midwest, which purports to be the "complete and exclusive statement" of the agreement between Shawmut and Midwest. It has all the makings of a bilateral contract: there are promises on both sides (Shawmut's promise to pay and Midwest's promise to deliver); duties on both sides (Shawmut's duty to pay and Midwest's duty to deliver); and rights on both sides (Midwest's right to payment and Shawmut's right to delivery). See E. Farnsworth, Contracts 109-10 (1982). Nothing in the agreement expressly states that Shawmut and Midwest have no rights under the contract as against each other. All indications are to the contrary, including language stating that the supplier's express warranties in the purchase order shall be valid and enforceable directly by PTM or Shawmut.
 
 
 20
 The applicable case law, though scant, supports the district court's finding that Shawmut was a buyer in the transaction. Evco Distributing Inc. v. Commercial Credit Equipment Corp., 6 Kan.App.2d 205, 627 P.2d 374 (1981), involved a tripartite transaction similar to the one at issue in the present case: (1) Evco was the supplier of the goods; (2) Harmack was the lessee; and (3) CCEC was the lessor. The goods were destroyed by fire after Evco had delivered them to Harmack but before CCEC had paid Evco. Evco sued CCEC for the purchase price of the goods, claiming that the risk of loss had passed to CCEC as buyer under U.C.C. Sec. 2-509(1)(b). CCEC argued, just as Shawmut does here, that its role in the transaction was that of a mere financing agent, not a buyer, and that therefore the risk of loss provisions should not be applied to it. The court concluded that CCEC was a buyer, and that the transaction between the supplier and the seller should be categorized as a sale for subsequent lease rather than a mere financing arrangement. See also Can-Key Industries, Inc. v. Industrial Leasing Corp., 286 Or. 173, 593 P.2d 1125 (1979) (treating lessor in tripartite transaction as buyer).
 
 
 21
 Academic commentary further bolsters the district court's conclusion. Professor Boss, in analyzing the unique issues surrounding tripartite transactions, discusses whether the finance lessor's role should be characterized as that of a "mere financier" rather than that of a buyer. According to Boss, such a characterization "oversimplifies the transaction and fails to recognize the complex relationship among the parties." Boss, B.U.L.Rev. at 58. She further explains:If the transaction were viewed merely as a sale or lease from supplier to lessee, with lessor as a mere financier, several consequences might flow. For example, the lessor might be deprived of any action against the supplier for damages sustained as a result of breach of the supply contract.... Or the lessee might be able to modify unilaterally the supply agreement with the supplier without the consent of the lessor....
 
 
 22
 Id. at n. 104. A review of the purchase order contract, pertinent case law, and academic commentary indicates that the district court correctly determined that Shawmut was a buyer in the transaction at issue.
 
 
 23
 Shawmut attacks the district court's holding on four grounds. First, Shawmut cites language in cases suggesting that lessors in tripartite transactions are not buyers. See, e.g., In the Matter of Sherwood Diversified Services, Inc., 382 F.Supp. 1359, 1363 (S.D.N.Y.1974) ("if acting as a financing agency, [a lessor] would not be considered a buyer or seller of the goods.") (emphasis added); CIT Financial Services, Inc. v. Gott, 5 Kan.App.2d 224, 615 P.2d 774, 780 (1980) ("There was a buyer-seller relationship between [lessees] and [supplier] with only a security interest in [lessor]."). In none of these cases, however, was the court required to decide the issue presented here, namely whether a supplier of equipment can rely on a lessor's purchase order for payment, irrespective of the lessor's status vis-a-vis the lessee. Had they been faced with this issue, these courts might well have reconsidered their broad dicta regarding the lessor/supplier relationship.
 
 
 24
 Second, Shawmut maintains that the district court's holding is a logical impossibility: if, according to the "scores of reported cases," Shawmut should not be characterized as a "seller," neither can this court treat Shawmut as a "buyer." Notwithstanding Shawmut's astute use of labels, the paradox created by Shawmut's argument is illusory. It requires no leap of logic to state that the terms of the purchase order between Shawmut and Midwest obligated Shawmut (as a "buyer") to purchase the machine and at the same time acknowledge that the terms of the lease between Shawmut and PTM may not have obligated Shawmut to warranty or pay certain taxes on it (as a "seller").
 
 
 25
 Third, Shawmut contends that its role as a finance lessor in the tripartite transaction is "functionally identical" to that of a lender who merely obtains a security interest in the buyer's machine. According to Shawmut, there would have been no difference in the "real economic effect" of the transaction if PTM had opted for a secured loan instead of a finance lease. We disagree. That Shawmut expressly reserved the right to enforce the warranty provisions of its purchase order contract with Midwest belies Shawmut's contention that it gained no additional commercial protection by purchasing the machine directly from Midwest and leasing it to PTM. The "real economic effect" of the present tripartite leasing transaction differed significantly from one in which a bank merely loans a business money to purchase equipment from a vendor. See generally Mooney, True Lease or Lease "Intended as Security"--Treatment by the Courts, in 1C P. Coogan, W. Hogan, D. Vagts & J. McDonnel, Secured Transactions Under the Uniform Commercial Code Sec. 29A.02 (reviewing advantages and disadvantages of acquiring equipment through leasing as opposed to alternative methods). Moreover, as the court below noted, if Shawmut were before this court in a different setting, it could be expected to argue that it was not a mere lender. See Ayer, On the Vacuity of the Sale/Lease Distinction, 68 Iowa L.Rev. 667, 698 (1983) ("It is usually in the creditor's interest to establish that he is a lessor rather than a secured creditor."); Note, Uniform Commercial Code: Article 2A--Leases: Structuring Priorities of Competing Claimants to Leased Property, 73 Minn.L.Rev. 208, 211 (1985) ("Unlike the creditor, the lessor can take advantage of tax benefits such as depreciation and applicable tax credits.").
 
 
 26
 Finally, Shawmut argues that the parties intended that Shawmut not be treated as a buyer. For example, Midwest's salesman referred to PTM as the "customer" and never made any demand upon Shawmut to become involved in his negotiations with PTM. This argument fails on two grounds. First, it ignores the written contract. Second, it disregards the fact that Midwest was unaware of the terms of Shawmut's lease with PTM. Shawmut cannot argue that both parties intended not to treat Shawmut as a buyer when one of the parties had no knowledge of the details of a key relationship which, according to Shawmut, determines Shawmut's status in the transaction.
 
 
 27
 We are satisfied that the district court did not err in finding that Shawmut was a buyer in the transaction at issue.
 
 III.
 
 28
 The second issue involves the effect of paragraph five of the purchase order contract between Shawmut and Midwest, which states:
 
 
 29
 Shawmut shall have no liability hereunder and may terminate this Purchase Order unless within 90 days after the date shown below (a) you shall have delivered all of the Equipment as above provided and we shall have received your invoice, (b) we shall have received Lessee's signed acceptance certificate acknowledging receipt of the Equipment in good condition and repair, accepting the Equipment as satisfactory in all respects, approving your invoice for the Equipment and requesting us to pay you the amount of such invoice.
 
 
 30
 The district court held that the interpretation of this paragraph was a matter of law, and instructed the jury that by this provision Shawmut delegated to PTM the task of performing Shawmut's duties with regard to accepting the machine, including the duty to accept or permit cure. Under this interpretation of paragraph five, the jury was free to find Shawmut liable for PTM's wrongful rejection of the machine. See Mass.Gen.Laws Ann. 106, Sec. 2-210 ("No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.").
 
 
 31
 On appeal, Shawmut does not dispute that PTM wrongfully rejected the machine. Rather, Shawmut contends that paragraph five insulates it from any liability for PTM's wrongful rejection. We disagree.
 
 
 32
 Two general propositions of contract construction inform our analysis of paragraph five. First, "[c]ontracts, where possible, are to be construed to reach a sensible result." Garbincius v. Boston Edison Co., 621 F.2d 1171, 1177 (1st Cir.1980). Second, in a case of doubt, a contract provision is to be construed against the party that drew it (in this case Shawmut). See Chelsea Industries, Inc. v. Accuray Leasing Corp., 699 F.2d 58, 61 (1st Cir.1983). See generally A. Farnsworth, Contracts at 498-99 (the "against the profferer" rule "may be invoked even if the parties bargained as equals.").
 
 
 33
 Here, we recognize that the language of paragraph five, read literally, supports Shawmut's construction: Shawmut never received a "signed acceptance certificate" from PTM and, therefore, it can be said, had no "liability thereunder." However, we think that paragraph five's requirement of a "signed acceptance certificate" was intended to protect Shawmut against the seller's non-performance, not to erect a technical barrier to Midwest's right to payment upon delivery either of conforming goods or else of nonconforming goods with a timely offer to cure made in conformity with Massachusetts law. See Mass.Gen.Laws Ann. ch. 106, Sec. 2-508 (granting seller right to cure).
 
 
 34
 We think the primary thrust of paragraph five in circumstances such as the present cannot be that Shawmut receive a signed certificate from its lessee but rather that the lessee receive the performance to which the certificate must attest: namely, that Midwest deliver the equipment "in good condition and repair, ... satisfactory in all respects ...". Paragraph five, reasonably construed, does not absolve Shawmut of its payment obligation when the seller has fully performed and the lessee has unlawfully rejected the goods. At trial, Midwest introduced evidence that the goods were conforming when delivered or, in the alternative, that it had made legally adequate offers to cure. Midwest promptly informed Shawmut of its delivery and of its position. The jury found that PTM and Shawmut had broken the contract on the day of delivery, when PTM first rejected the machinery. Midwest thus met all of its substantive obligations under the contract, and Shawmut must meet its obligation to pay for the delivered equipment.
 
 
 35
 Shawmut's interpretation of paragraph five would contradict the well-recognized commercial practice of relying on section 2-508 of the Uniform Commercial Code in transactions involving the sale of goods. See U.C.C. Sec. 2-508, Comment 2 (stating that the goal of Sec. 2-508 is "to avoid injustice to the seller by reason of a surprise rejection by the buyer"); J. White and R. Summers, Uniform Commercial Code Sec. 8-5 at 425 (3d ed. 1988) (commenting that "2-508 simply recognizes a general pattern of business behavior and adds a legal sanction to those economic and nonlegal sanctions which parties had and still have."); W. Lawrence, Cure After Breach of Contract Under the Restatement (Second) of Contracts: An Analytical Comparison with the Uniform Commercial Code 70 Minn.L.Rev. 713, 734 (1986) (recognizing the importance of the right to cure in situations involving the sale of goods, where seller is subject to the perfect tender rule). Without reaching the question of whether Shawmut's reading of the paragraph would violate public policy, we believe the district court correctly interpreted the language of the contract in its "ordinary and usual sense," cf. Burnham, Etc. v. Guardian Life Ins. Co. of America, 873 F.2d 486, 490 (1st Cir.1989), when it held that Shawmut merely delegated to PTM its duty to accept or permit cure. Before we would accept Shawmut's interpretation (and thus reach the public policy question) we would expect explicit language showing that the parties meant to excuse Shawmut from a buyer's normal duty to accept and pay for conforming goods and to permit cure when appropriate.
 
 
 36
 In support of its position, Shawmut cites Can-Key Industries, Inc. v. Industrial Leasing Corp., 286 Or. 173, 593 P.2d 1125 (1979). Can-Key involved a similar tripartite leasing arrangement: (1) plaintiff Can-Key was the supplier; (2) Rose-A-Linda was the lessee; and (3) defendant ILC was the lessor. As in the present case, ILC (the lessor) first purchased the equipment from Can-Key (the supplier) and then leased it to Rose-A-Linda (the lessee). In the purchase order contract between ILC and Can-Key, the parties agreed that
 
 
 37
 This order is conditioned upon your assurance that lessee has selected the equipment described above and will accept same on delivery. If lessee does not accept the equipment for any reason, we shall have no obligation hereunder, and you shall refund to us all sums (including taxes, transportation, charges and other charges) paid for or on account of the equipment.
 
 
 38
 Can-Key, 593 P.2d at 1129. After Can-Key and ILC signed the purchase order, Can-Key delivered defective goods to Rose-A-Linda. Although Rose-A-Linda complained, Can-Key failed to cure the defects. When ILC refused to pay the purchase price, Can-Key sued ILC for breach of contract. The issue before the district court was whether Rose-A-Linda had "accepted" the equipment and thus waived ILC's right to refuse payment. Can-Key successfully argued to the district court that the mere fact that the lessor leased the equipment to the lessee demonstrated an acceptance. The appeals court reversed, holding that "the parties expressly agreed that the defendant's obligation to pay would be conditioned upon acceptance of the equipment by Rose-A-Linda." Id. at 1130 n. 2. It explained that the "clause requiring acceptance by the lessee was inserted to protect defendant from the possibility that it would be required to purchase equipment that its lessee would be entitled to reject." Id. (emphasis added). The court concluded that the lessee was entitled to reject the equipment in the manner it did. From this language, Shawmut asserts that "the holding of [Can-Key is] that the duty of acceptance was owed by the lessee, not the finance lessor."We are unable to agree with Shawmut's reading of Can-Key. As the district court noted, Can-Key merely stands for the uncontroversial proposition that a supplier in a tripartite leasing transaction must demonstrate that a lessee "accepted"--or was not "entitled to reject"--its equipment before it can sue the lessor for breach of contract. Nowhere in Can-Key does the court imply that a supplier cannot sue a lessor for the lessee's wrongful rejection. Here, unlike the plaintiff in Can-Key, Midwest has established that PTM violated its duty to accept or permit cure by wrongfully rejecting the machine. It has thus established that PTM was not "entitled to reject" the machine. Can-Key lends support to Midwest's position, not Shawmut's.
 
 
 39
 Moreover, the language of paragraph five is even narrower than that present in Can-Key. The contract in Can-Key allowed rejection "for any reason." In the present case, the relevant paragraph refers to a "satisfactory" standard. Despite this "satisfactory" language, Shawmut would have this Court interpret paragraph five so that Shawmut could avoid liability if PTM rejects the machine for any reason, even if the machine were satisfactory in all respects. At least in the absence of much more explicit language, such an interpretation must be rejected.
 
 
 40
 For similar reasons, Shawmut's remaining arguments regarding paragraph five, e.g., that it established a condition precedent, must fail. Cf. Commerce Ins. Co. v. Koch, 25 Mass.App.Ct. 383, 385, 522 N.E.2d 979, 980 (1988) ("quite emphatic words are required to create a condition precedent forfeiting or limiting rights, and no such words appear here."). Paragraph five simply delegated to PTM Shawmut's duty to accept or permit cure, a duty which PTM breached.
 
 IV.
 
 41
 Because Midwest contests the jury instructions as they relate to both its breach of contract claim and its intentional interference with contractual relations claim, we separately review the instructions as they apply to each claim.
 
 A. Breach of Contract
 
 42
 "Our principal focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues." Service Merchandise Co., Inc. v. Boyd Corp., 722 F.2d 945, 950 (1st Cir.1983). In the present case, a careful review of the instructions leads us to conclude that the damages portion of the instructions could have only confused the jury. The instructions, we find, included certain serious inconsistencies.
 
 
 43
 The court's initial instructions on liability for breach of contract were proper. On Midwest's claim against Shawmut, the district court told the jury that a contract existed between Shawmut and Midwest, and that Shawmut delegated to PTM its duty to accept or permit cure. In order to determine whether a breach occurred, the jury was told to consider whether PTM's rejection was wrongful. If so, Shawmut would have to pay damages for breach of contract.
 
 
 44
 On Midwest's claim against PTM, the court told the jury that it should first decide whether a separate contract existed between Midwest and PTM. If the jury found that such a contract existed, it then should determine whether a breach occurred. To determine this, the jury was instructed to apply the same analysis as described above. That is, the jury was told to consider whether PTM's rejection was wrongful.
 
 
 45
 The court's instructions on damages for breach of contract comprised two sets: the first was correct, the second, unfortunately, constituted reversible error. In the first set, the court instructed the jury to measure damages as follows:
 
 
 46
 Midwest has claimed as damages on its contract claims against both Shawmut and PTM, the difference between the contract price which it would have received from Shawmut under the purchase order, $345,000, and the net proceeds which Midwest received from its resale of the machine.... The net proceeds of the resale is the difference between the resale price received ... and the reasonable expenditures made by Midwest in order to resell the machine.... This is the proper manner in which to calculate the amount of damage to which Midwest may be entitled.
 
 
 47
 Thus, the method used for determining the amount of damages that Midwest suffered as a result of the alleged breach of contract by Shawmut was identical to the one used for determining the amount of damages suffered as a result of the alleged breach of contract by PTM: each required the jury to determine the difference between the contract price and the net proceeds from the resale. The logical implication of this proper and clear instruction (to which neither party objected) is that, if the jury found that both Shawmut and PTM breached their respective contracts with Midwest, the damages should be identical. Of course, in such a case Midwest could not enforce its judgment against both defendants, but it was entitled to receive a jury verdict of full damages against each party.
 
 
 48
 In the second set, the court, without any prompting from either party, instructed the jury not to duplicate damages on any claim:
 
 
 49
 That is, if you should decide that Midwest should recover damages, you may not exceed the highest amount of damages proved by Midwest. So, be sure not to duplicate any damages you feel should be awarded to Midwest.
 
 
 50
 Ordinarily, a district court acts properly when it instructs a jury not to duplicate its award of damages on one count when awarding damages on a separate count. See, e.g., Wynn Oil Co. v. Purolator Chemical Corp., 403 F.Supp. 226, 230-32 (M.D.Fla.1974) (recognizing appropriateness of nonduplication of damages charge). Here, however, the instruction against duplicating damages necessarily conflicted with the court's previous instruction to use the same method for calculating damages for each of Midwest's breach of contract claims.
 
 
 51
 To illustrate, suppose that, after the jury found that both Shawmut and PTM had broken their respective contracts, the jury determined that Midwest's breach of contract damages (the difference between the contract price and the net proceeds from Midwest's resale of the machine) totaled $100. Given this finding, the only logical course of action available would be to award Midwest damages of $100 for each of its two contract claims. With the court's nonduplication of damages charge, however, the jury could not award a duplicate amount. The jury could not possibly follow both sets of instructions; rather the best it could do would be to follow one set of instructions and ignore the other, thus either duplicating damages or apportioning them.
 
 
 52
 A jury cannot be expected to apply mutually conflicting jury instructions, where each set makes sense independent of the other. As the Fifth Circuit stated in reversing a district court's instructions on breach of contract damages, the jury instructions must provide "the jury with the instructional equivalent of the mariner's compass and sea-lane map in order that the lay jurors might successfully complete their voyage." Jamison Co., Inc. v. Westvaco Corp., 526 F.2d 922, 934 (5th Cir.1976). Here, the court's conflicting instructions with regard to breach of contract damages compelled the jury to move in opposite directions and thus constituted error. See C. Wright & A. Miller, Federal Practice & Procedure Sec. 2886 at 294 (1973).
 
 
 53
 Shawmut presents four independent theories in support of the district court's nonduplication of damages charge: (1) the terms of the separate oral or implied contract between Midwest and PTM may have differed from those of the contract between Midwest and Shawmut; (2) PTM alone may have breached the covenant of good faith; (3) PTM's breach may have caused more damages than Shawmut's breach; and (4) PTM may have foreseen more damages than did Shawmut. Shawmut's theories fail for a variety of reasons, but the principal defect in each theory is that it overlooks the first set of instructions on damages, namely that the jury should use the same method to calculate damages against Shawmut as it used to calculate damages against PTM. Not only was this instruction correct, but Shawmut failed to object below and offers no criticism of it on appeal. Consequently, it is impossible for either Shawmut or this court to develop a coherent theory in support of the district court's nonduplication of damages charge.
 
 
 54
 In the alternative, Shawmut urges that Midwest "now complains of the result of an instruction Midwest asked for." Shawmut correctly notes that Midwest asked for and essentially received the following general instruction:
 
 
 55
 you may award the same amount on each claim, or you may award different amounts, but your findings must be based on the evidence. Even if you award Midwest damages on more than one of its claims, and even if you award Midwest damages from both Shawmut and PTM, Midwest may only recover once for the same injury.
 
 
 56
 According to Shawmut, Midwest led the court into error when it proffered the underscored passage as part of the instruction.
 
 
 57
 We cannot agree. Although the second clause of the instruction ("you may award different amounts,") ostensibly conflicts with the court's earlier instruction regarding the method for calculating breach of contract damages against PTM and Shawmut, the conflict in no way rises to the level of reversible error. Unlike the court's instruction to "be sure not to duplicate any damages you feel should be awarded to Midwest....", this instruction, read in its entirety, does not force the jury to move in opposite directions. Returning to the above hypothetical, if the jury found that the total contract damages equaled $100, the first clause of the instruction ("you may award the same amount on each claim,") would allow the jury to award $100 in damages against PTM and Shawmut. To be sure, the second clause would allow the jury to award different amounts, but it would not compel the jury to do so. The jury would thus feel free to award $100 in damages against each party as required by the earlier instruction on calculating breach of contract damages. Hence Shawmut's "invited error" argument fails.
 
 B. Tortious Interference
 
 58
 Midwest further argues that the court erred in its instruction with regard to Midwest's damages against PTM for tortious interference with contractual relations. The court told the jury:
 
 
 59
 If you were to find not only breach of contract, but also that PTM tortiously interfered with Midwest's and Shawmut's contractual relations, you may not award Midwest damages which duplicate those you awarded for the breach of contract. In other words, in this instance, you might only award on the tort claim to the extent the injury caused thereby exceeds that resulting from the breach of contract claims.
 
 
 60
 The district court erred when it instructed the jury not to duplicate damages. True, the court correctly implied that Midwest cannot collect damages both for Shawmut's breach of contract and PTM's wrongful inducement of that breach. See Laurendeau v. Kewaunee Scientific Equipment, 17 Mass.App.Ct. 113, 456 N.E.2d 767 (1983); Restatement (Second) of Torts, Sec. 774A(2) and comment (e) (1979). However, the issue of double recovery should be resolved after rather than before the jury has returned a verdict on each claim.
 
 
 61
 Section 774A(2) of the Restatement, cited with approval in Laurendeau and Charles River Const. Co. v. Kirksey, 20 Mass.App.Ct. 333, 480 N.E.2d 315, 322 (1983), declares that in "an action for interference with a contract by inducing or causing a third person [Shawmut] to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor [PTM]; but the damages actually paid by the third person will reduce the damages actually recoverable on the judgment." The district court's instruction is inconsistent with this principle.
 
 
 62
 The error does not, however, require reversal. Midwest seeks to have the option of choosing to collect its breach of contract damages from PTM rather than Shawmut. Given the court's instruction on damages for tortious interference, Midwest claims that it can collect its breach of contract damages only from Shawmut. However, because of the unique circumstances of this case, PTM has also been found liable for breach of contract. Moreover, the damages for this breach, when properly determined on remand, will be equal to the damages awarded against Shawmut, see supra. Midwest may then collect its breach of contract damages from either party. Thus, the tortious interference damages ($2,807.55) may stand as found.
 
 V.
 
 63
 Midwest insists that the district court erred in dismissing its 93A claims against PTM and Shawmut. The district court found that "[a]t its worst, PTM's wrongful rejection was accomplished with an eye towards the betterment of its business stance, not with an intent to sabotage or prejudice Midwest." The court also could find "no conceivable basis for attributing PTM's conduct to Shawmut" for the purposes of Midwest's 93A claim. We are not inclined to disturb the district court's conclusion that PTM's conduct failed to reach the "level of rascality" necessary to establish a chapter 93A claim. See Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979) (section 11 violation recognized when conduct "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."); Doliner v. Brown, 21 Mass.App.Ct. 692, 489 N.E.2d 1036, 1040 (1986).
 
 
 64
 PTM contested Midwest's claims in good faith and brought a counterclaim for breach of contract against Midwest which the district court allowed to go to the jury. That the jury then found PTM liable for breach of contract and tortious interference with contractual relations is not automatic grounds for liability under 93A. See Madan v. Royal Indem. Co., 26 Mass.App.Ct. 756, 532 N.E.2d 1214, 1217 (1989) (reiterating established rule that "the mere breach of contract, without more, does not amount to a chapter 93A violation."); Gopen v. American Supply Co., Inc., 10 Mass.App.Ct. 342, 407 N.E.2d 1255, 1259 (1980). Midwest must demonstrate how the particular actions of PTM (and Shawmut) rise to the level of unfairness required under 93A. See, e.g., Wang Laboratories v. Business Incentives, 398 Mass. 854, 501 N.E.2d 1163, 1165-66 (1986) (breach of contract committed in order "to obtain the benefits of [the] contract without cost ..." violates 93A.'). Midwest has failed to demonstrate any particular "unfair" acts by PTM or Shawmut, apart from PTM's rejection of the machine. We affirm the district court's dismissal of these claims.
 
 VI.
 
 65
 Finally, given the court's error when it instructed the jury against duplicating damages, we must decide whether to order a new trial on the issue of breach of contract damages only or, as Midwest requests, reform the judgment. Midwest requests that we "adjust" the jury verdict by combining the two breach of contract damage awards and entering judgment in the total amount of both against Shawmut and PTM. Midwest argues that the only "rational and consistent construction" of the jury's verdict is that Midwest's total breach of contract damages equaled the combined damages awarded against Shawmut and PTM. Following this course would quadruple the damages against Shawmut and increase by one-third the damages against PTM.
 
 
 66
 Midwest cites little legal authority to support such a course in these circumstances, and we decline to adopt its theory. Without reaching the issue of whether Midwest's proposed adjustment would constitute an improper additur, we find no basis for adjusting the jury's verdict. We cannot agree with Midwest that the only "rational and consistent construction" of the jury's verdict is that Midwest's total breach of contract damages equaled the combination of damages awarded against Shawmut and PTM. We have no way of knowing what motivated the jury to award the oddly configured damages that it did--whether it meant to follow the correct set of instructions or the incorrect one, or whether it was simply confused. The district court was correct that "there is no legally cognizable mechanism for inquiring into the heads of jurors to determine their basis in awarding damages." Indeed, to reform the judgment in the manner requested by Midwest could subvert rather than fulfill the jury's actual intentions. See Robinson v. Watts Detective Agency, 685 F.2d 729, 742 (1st Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1982) ("A motion to alter or amend judgment pursuant to Rule 59(e) may not be granted where to do so would undermine the jury's fact-finding role and trample on the defendant's seventh amendment right to a jury trial.").
 
 
 67
 We, therefore, vacate the judgment and remand for a new trial limited to the amount of damages owed by Shawmut and PTM for the breach of contract already found. See Kinnel v. Mid-Atlantic Mausoleums, Inc., 850 F.2d 958, 969 (3d Cir.1988) ("The ambiguity in the jury's verdict which necessarily resulted from the district court's instructions and the form of the special interrogatories which the jury was required to answer so flaws the judgment for damages against Mid-Atlantic that we are obliged to order a new trial on damages only."). In all other respects, we affirm.
 
 
 68
 So ordered.
 
 APPENDIX
 PURCHASE ORDER
 Lessor: Shawmut Bank of Boston
 
 69
 [address]
 
 
 70
 Lessee: PTM Industries Corp.
 
 
 71
 [address]
 
 
 72
 Supplier: Midwest Precision Services c/o Promatool, Inc.
 
 
 73
 [address]
 
 Equipment
 Quantity: 1
 
 74
 Description: Maegerle, Crush & Creep Feed Grinder
 
 Total Cost: $345,500.00
 
 75
 SHAWMUT BANK OF BOSTON, N.A. ("Shawmut") does herewith order from you, the Supplier named above, the Equipment described above and/or on the exhibit attached hereto ("Equipment") subject to the following terms and conditions.
 
 
 76
 1. This Purchase Order is intended to be a complete and exclusive statement of the agreement between us and no changes whatsoever will be authorized without our written consent.
 
 
 77
 2. The TOTAL COST of the Equipment set forth above, which is to be leased by Shawmut to the above Lessee, includes all shipment and transportation costs incurred to ship the Equipment to the location indicated above, as well as the purchase price of the Equipment itself.
 
 
 78
 3. The Equipment is to be shipped to us at the location set forth above in care of the above-named party (the "Lessee") who is to lease the Equipment from us.
 
 
 79
 4. You warrant that (a) if the lease of the Equipment between Shawmut and the Lessee was signed in the presence of your salesman, representative or agent, each person who signed the lease on behalf of the Lessee was authorized to do so, (b) the Equipment delivered to the Lessee shall conform to the description of the same indicated above; the Equipment shall be fit and sufficient for its intended purpose, merchantable, of good quality, free from defects in material or workmanship; the foregoing is in addition to and not in lieu of any and all other warranties, written or oral, express or implied, with respect to the Equipment made by you to the Lessee or to us, or deemed to have been so made as a matter of law, and any and all such warranties shall be valid and enforceable directly by Lessee and/or us, (c) you will invoice Shawmut for all Equipment, (d) title to the Equipment shall pass directly from you to us free and clear of all liens and encumbrances, and (e) all risk of loss or damage to any of the equipment shall be borne by you until it has been delivered and installed (to the extent applicable) in the Lessee's facilities at the location indicated above.
 
 
 80
 5. Shawmut shall have no liability hereunder and may terminate this Purchase Order unless within 90 days after the date shown below (a) you shall have delivered all of the Equipment as above provided and we shall have received your invoice, (b) we shall have received lessee's signed acceptance certificate acknowledging receipt of the Equipment in good condition and repair, accepting the Equipment as satisfactory in all respects, approving your invoice for the Equipment and requesting us to pay you the amount shown of such invoice.
 
 
 81
 6. Our term of payment to you is five days from date of receipt of the acceptance certificate signed by Lessee.
 
 
 82
 7. If Lessee has given you a deposit, Shawmut must be invoiced for the TOTAL COST of the equipment, and the deposit repaid by you to Lessee within 10 working days of the receipt of full payment by Shawmut.
 
 Shawmut Bank of Boston, N.A. (Lessor)
 Signature dated November 9, 1982
 
 
 *
 Of the District of Massachusetts, sitting by designation